# United States Court of Appeals
## For the First Circuit

No. 01-2500

UNITED STATES OF AMERICA,

Appellee,

v.

STANLEY M. PIPER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Selya, Lynch and Howard,

Circuit Judges.

Edward S. MacColl, with whom Thompson, Bull, Furey, Bass & MacColl, LLC, P.A., was on brief, for appellant.
Margaret D. McGaughey, Assistant United States Attorney (Appellate Chief), with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

July 26, 2002

**SELYA**, <u>Circuit Judge</u>. Following his conviction for both distributing cocaine and conspiring to engage in distribution, defendant-appellant Stanley M. Piper challenges the district court's admission of certain tape-recorded conversations between an alleged coconspirator, Anthony Stilkey, and various third parties. The court admitted these statements under Evidence Rule 801(d)(2)(E) (the so-called coconspirator hearsay exception). After careful consideration, we conclude that one of these conversations did not involve statements made in furtherance of the conspiracy (and, therefore, should have been excluded). Nevertheless, the erroneous admission of those statements does not warrant reversal, and the appellant's challenge to the sufficiency of the evidence is hopeless. Consequently, we reject Piper's appeal.

## I. BACKGROUND

We present a balanced account of the background facts, gleaned from the trial transcript. Stilkey and the appellant worked together at Bath Iron Works in Bath, Maine. The activities with which we are concerned began on April 8, 1999, when Stilkey met with a man known only as Rodney. Unbeknownst to Stilkey, Rodney was an informant for the Drug Enforcement Administration (DEA), which had equipped him with a body wire and organized a surveillance team to monitor his movements.

The April 8 meeting took place at the Bath post office. During the meeting, Stilkey agreed to sell Rodney two "eight balls" of cocaine (roughly 3.5 grams apiece) for $500. After receiving the funds, Stilkey proceeded directly to the appellant's apartment. He handed over the money in exchange for two glassine baggies containing powdered cocaine. Stilkey removed some of the cocaine for his own use and delivered the remainder to Rodney at the post office.

Subsequently, Rodney told Stilkey that an acquaintance, Uri Shafir, wanted to purchase half an ounce of cocaine. Rodney arranged for Stilkey and Shafir to meet at the same post office on April 13, 1999. The surveillance team was alerted. Shafir (an undercover DEA agent) gave Stilkey a $500 "deposit." The two men then exchanged telephone numbers and agreed upon a pager code to signal that the drugs were ready for delivery. Stilkey repaired to the appellant's apartment and gave him the money. Upon leaving, Stilkey walked over to the appellant's automobile and placed something inside the glove compartment. The appellant emerged from his apartment, spoke briefly to Stilkey, and drove away.

Later that afternoon, Stilkey paged Shafir and arranged to meet him near Stilkey's place of abode. Shafir proceeded to this location and parked in a neighbor's driveway. Stilkey and his wife, Jennifer, testified that the appellant already was inside the

house at that moment.[1]  The appellant handed a bag of cocaine to Stilkey, who walked to Shafir's vehicle, showed him the drugs, and informed him that they would cost "an extra hundred."  Shafir questioned both the quantity and the quality of the contraband.  In response, Stilkey offered to get his source's scales to verify the weight.

In an effort to ease this impasse, Stilkey reentered his home and told the appellant that the customer "wanted to try [the drugs] first."  The appellant balked at this suggestion.  Stilkey then carried a set of scales outside, weighed the drugs in front of Shafir, and swapped the cocaine for an additional payment of $900.  When Stilkey returned, he handed the money to the appellant.

A third, and final, episode took place on April 20, 1999.  Shafir arranged with Stilkey to purchase a half-ounce of cocaine for $1,000.  He drove to Stilkey's house and consummated the transaction there.  Stilkey testified that the appellant furnished the cocaine and ultimately received the proceeds.  At around the same time, the appellant left for Florida.  Stilkey immediately tried to interest Shafir in purchasing drugs derived from a new source (one Paul Mounts) and the focus of the investigation shifted.

---

[1]Shafir added that, while he was waiting, he noticed the appellant's car parked in close proximity to the Stilkey residence.

On December 19, 2000, a federal grand jury indicted the appellant on charges that he had distributed cocaine on April 13, 1999, and had conspired with Stilkey to distribute cocaine during that month. See 21 U.S.C. §§ 841(a)(1), 846. The appellant protested his innocence and the case went to trial. After Stilkey testified about the three transactions described above, the district court, over objection, made a closely reasoned Petrozziello finding, see United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977), and admitted into evidence seven secretly recorded conversations that had taken place between Stilkey and various third parties.[2] Shafir, Jennifer Stilkey, a forensic chemist, and two members of the police surveillance team also testified for the government. The defense predicated its case almost entirely on the testimony of the appellant's girlfriend, who testified that she and the appellant attended "drug parties" with the Stilkeys, and painted a picture of all four as recreational users of cocaine. The jury found the appellant guilty on both counts and the court sentenced him to a 27-month incarcerative term. This timely appeal followed.

## II. COCONSPIRATOR STATEMENTS

The central question in this appeal is whether the trial court erred in admitting into evidence any or all of the seven taped conversations. We turn first to that issue.

---

[2]An appendix to this opinion indexes the seven conversations.

Hearsay evidence ordinarily is inadmissible in criminal trials. Like most general rules, however, that rule is subject to certain exceptions. One such exception allows an out-of-court statement made "by a coconspirator of a party during the course and in furtherance of the conspiracy" to be offered into evidence against that party. Fed. R. Evid. 801(d)(2)(E). To invoke this exception, "[t]he proponent of the statement bears the burden of establishing, by a preponderance of the evidence, that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." United States v. Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002) (citation and internal quotation marks omitted), petition for cert. filed (June 25, 2002) (No. 02-5015). The first half of this two-part requirement demands the introduction of extrinsic evidence; coconspirator statements are not deemed self-elucidating, and to ensure admissibility the proponent must present other evidence sufficient to delineate the conspiracy and corroborate the declarant's and the defendant's roles in it. See United States v. Sepulveda, 15 F.3d 1161, 1181-82 (1st Cir. 1993); see also Fed. R. Evid. 801(d)(2)(E) (providing that the contents of the proffered hearsay statement, standing alone, are insufficient "to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered").

The appellant contends that the district court committed a global error in administering Rule 801(d)(2)(E) because it permitted the introduction of the tape-recorded conversations even though the government had failed to adduce sufficient foundational evidence to establish the existence of a conspiracy in which both he and Stilkey were participants. His backup position is that two particular conversations — one that occurred on April 8 and another that occurred on April 22 — were inadmissible on narrower grounds. We consider these contentions sequentially.

## A. **Foundational Evidence**.

We give short shrift to the claim that the government failed to adduce sufficient evidence to demonstrate the existence of a conspiracy involving Stilkey and the appellant. This foundational requirement is satisfied as long as the government proffers sufficient evidence to establish, by a preponderance of the evidence, the existence of a conspiracy embracing both the declarant and the defendant. Sepulveda, 15 F.3d at 1180; Petrozziello, 548 F.2d at 23. The trial court acts as the gatekeeper; it bears the responsibility for resolving the question of whether evidence proffered under Rule 801(d)(2)(E) satisfies these criteria. See Fed. R. Evid. 104(a) (explaining that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court"); see also Earle v. Benoit, 850 F.2d 836, 840-41 (1st Cir. 1988).

-7-

Here, the government brought forth a cornucopia of extrinsic evidence (e.g., Stilkey's testimony about his relationship with the appellant, Jennifer Stilkey's corroborative testimony, Shafir's testimony, and the testimony of two surveilling detectives) from which a factfinder could conclude, more likely than not, that a conspiracy existed between Stilkey and the appellant to purvey cocaine. Thus, we reject the claim that the government failed to satisfy this foundational requirement.

## B. **The April 8 Conversation**.

This brings us to the April 8 conversation. The appellant points out that this tape captured a conversation between Stilkey and Rodney (the government's informant). From this, he argues that statements made to a government informant cannot be admitted under the coconspirator hearsay exception because the informant, by definition, cannot be deemed to be a coconspirator.

This argument is decisively refuted by a long line of cases. See, e.g., United States v. Singleton, 125 F.3d 1097, 1107 (7th Cir. 1997); United States v. Flores-Rivera, 56 F.3d 319, 330 (1st Cir. 1995); United States v. Formanczyk, 949 F.2d 526, 531 (1st Cir. 1991). The black-letter principle is that statements made in the course of a discussion between a coconspirator and a third party who is a stranger to the conspiracy are admissible under Rule 801(d)(2)(E), provided that they meet the Rule's foundational requirements. That is true regardless of whether the

-8-

third party is a tipster, an informant, an undercover officer, or a mere acquaintance. It follows inexorably that the district court did not err in admitting the statements made on April 8 even though one of the participants in the conversation (Rodney) was an informer rather than a coconspirator.

### C. **The April 22 Conversation**.

The appellant's argument against the admissibility of the April 22 conversation is multifaceted. First, he posits that even if the evidence supported a finding that he and Stilkey were coconspirators, that conspiracy terminated no later than April 20, 1999 (and that, therefore, Stilkey's statements on April 22 could not have been uttered during the course of the conspiracy). To support this position, the appellant notes that (1) Stilkey testified at trial that he never sold drugs procured from the appellant at any time after April 20, and (2) Stilkey told Shafir on April 22 that he was no longer using the appellant as his supplier. Despite these facts, the appellant's argument lacks force.

"Where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated." United States v. Elwell, 984 F.2d 1289, 1293 (1st Cir. 1993) (citation omitted). That principle is apposite here: given that the charged conspiracy included three separate drug sales spanning

a thirteen-day period, it was plausible for the court to presume that the conspiracy continued to exist beyond the date of the last reported sale. This is particularly true in view of the fact that the record contains no affirmative showing of a withdrawal on or before April 22.

We have made manifest that in order to withdraw from a conspiracy, "a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy." United States v. Juodakis, 834 F.2d 1099, 1102 (1st Cir. 1987) (per curiam). Typically, that requires "either . . . a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." Id. Judged against this strict standard, neither Stilkey's trial testimony nor his statements during the April 22 conversation constitutes an affirmative showing that the conspiracy ended coincident with the consummation of the April 20 sale. After all, "[m]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal" from a conspiracy. Id. (citation omitted).

We need not belabor the obvious. We review the district court's fact-based findings under Rule 801(d)(2)(E) only for clear error. Sepulveda, 15 F.3d at 1180. Here, the court's determination that the government adduced adequate evidence of a conspiracy between Stilkey and the appellant, lasting at least

-10-

through April 22, was not clearly erroneous. Accordingly, we reject this facet of the appellant's assignment of error.

Relatedly, the appellant claims that Stilkey's April 22 statements were not made in furtherance of the charged conspiracy. The determination of whether an out-of-court statement furthers a conspiracy to such an extent as to justify admissibility under Rule 801(d)(2)(E) is a preliminary question of fact that must be resolved by the trial judge. Bourjaily v. United States, 483 U.S. 171, 175 (1987); Earle, 850 F.2d at 840-41. In making that determination, the judge applies a preponderance-of-the-evidence test. Petrozziello, 548 F.2d at 23.

The "in furtherance" question defies mechanical solutions: there is no precise formula for determining whether a coconspirator statement advances a conspiracy. Generally speaking, however, a coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy. United States v. Fahey, 769 F.2d 829, 839 (1st Cir. 1985). To be deemed "in furtherance," a statement "need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way." United States v. Martinez-Medina, 279 F.3d 105, 117 (1st Cir.), cert. denied, 122 S. Ct. 2608 (2002). In other words, the connection need not be inexorable.

-11-

Even so, the proponent of the out-of-court statement (typically, the government) is not entitled to a free pass. A judicial determination that a coconspirator's statement tended to further the conspiracy must be supported by some plausible basis in the record. United States v. McKeeve, 131 F.3d 1, 12 (1st Cir. 1997). To that extent, the "in furtherance" requirement represents a real limitation on the admissibility of coconspirator statements. See Garlington v. O'Leary, 879 F.2d 277, 283 (7th Cir. 1989); Fahey, 769 F.2d at 838-39.

Against this backdrop, the district court's determination that the April 22 statements were "in furtherance" of the charged conspiracy does not pass muster. At the start of that conversation, Stilkey mentioned to Shafir that his drug source was in Florida because "he had burned too many [expletive deleted] people." Stilkey added that he had told his source about Shafir's dissatisfaction with the quality of the cocaine delivered in the April 20 transaction. Next, Shafir inquired about the availability of an alternate source of supply and how he might be able to tap into that source. In the course of the ensuing discussion, Stilkey commented that a particular individual had been "burned by Stanley." When Shafir expressed curiosity about "Stanley," Stilkey identified "Stanley" as the source of the cocaine that he previously had sold to Shafir. From that point forward, the conversation dealt mainly with the possibility of an alternate

-12-

source (although Stilkey interspersed several derogatory comments both about his original supplier — "Stanley" — and about "Stanley's" wares).  The government contends that the ubiquitous "Stanley," repeatedly mentioned by Stilkey, was the appellant (Stanley Piper), and Stilkey confirmed that fact during his trial testimony.

A reasoned assessment as to how (if at all) this conversation related to the charged conspiracy requires us to review the dimensions of that conspiracy.  Although the indictment alleged that the appellant had conspired with Stilkey and other persons "known and unknown" to the grand jury, the government offered no proof at trial that the charged conspiracy extended beyond Stilkey and the appellant.  And although the rigors of Rule 801(d)(2)(E) may be satisfied by showing that both the declarant and the defendant belonged to some conspiracy other than the substantive conspiracy charged in the indictment, see United States v. Lara, 181 F.3d 183, 196 (1st Cir. 1999), the government has chosen to argue in this case that the Rule 801(d)(2)(E) conspiracy was functionally equivalent to the charged conspiracy and that the tape-recorded statements were admissible solely by reason of the charged conspiracy (rather than some uncharged conspiracy involving both Stilkey and the appellant).[3]

---

[3]The government makes a vague allusion to a broader conspiracy involving Stilkey, the appellant, and the new supplier (Mounts) proposed by Stilkey to Shafir.  The fly in the ointment, however,

The charged conspiracy involved Stilkey's agreement to distribute drugs supplied by the appellant. That configuration defeats the government's "in furtherance" argument. Stilkey's April 22 conversation with Shafir is most accurately characterized as an attempt to persuade Shafir to purchase drugs from a source other than the appellant. Thus, Stilkey's statements on that date were antithetic to the central object of the charged conspiracy. Statements that are designed to frustrate rather than to further the goals of a conspiracy are not admissible under the aegis of Rule 801(d)(2)(E). See Martinez-Medina, 279 F.3d at 117.

This state of affairs distinguishes the April 22 conversation from the coconspirator statements held admissible in United States v. Masse, 816 F.2d 805 (1st Cir. 1987). There, an undercover agent, masquerading as a drug buyer, inquired about the identity of an individual who had arrived on the scene in the same vehicle as the seller. Id. at 810. The seller responded by identifying the individual as "the source for the cocaine." Id. We upheld the trial court's determination that the seller's identification of his source tended to advance the goal of the conspiracy because the declarant reasonably could have believed that an unsatisfactory answer to his customer's question would queer the deal. Id. at 811. Thus, identification of the source

is that the government did not adduce any extrinsic evidence sufficient to establish that Mounts was a member of any such conspiracy.

-14-

furthered the ultimate object of the conspiracy — the consummation of a cocaine sale. Id.

The instant case stands in stark contrast. Although Stilkey's identification of "Stanley" as his former cocaine supplier may have been calculated to develop rapport with Shafir (and, thus, serve Stilkey's personal interest in retaining a customer), it in no way advanced the goal of effecting cocaine sales through the Stilkey/Piper conspiracy. So viewed, the statements cannot plausibly be said to further the ends of that conspiracy.[4]

The government has three more arrows in its quiver. In ruling that Stilkey's April 22 statements were in furtherance of the charged conspiracy, the able district judge noted that statements following the completion of a conspiracy's business "often serve a purpose of concealing or hindering the [apprehension] of those involved," and, thus, may tend to aid the conspiracy. Although this observation is sound, see, e.g., United

---

[4]The appellant also argues, albeit perfunctorily, that Stilkey's conversation with Rodney on April 8 did not further the charged conspiracy (and, therefore, should not have been admitted into evidence). Masse sets that argument to rest. The April 8 discussion paved the way for the first transaction: Stilkey's remarks describing his source's idiosyncracies (e.g., his insistence on cash, his trips to New Hampshire to buy drugs, his difficulties in communicating with Dominican suppliers, and his dissatisfaction with the quality of drugs obtained) were plainly designed to allay Rodney's concerns and induce him to purchase drugs derived from the appellant. As such, these secretly recorded statements tended to advance the conspiratorial object of selling cocaine supplied by the appellant. See Masse, 816 F.2d at 811.

<u>States</u> v. <u>Davis</u>, 623 F.2d 188, 191-92 (1st Cir. 1980), it is inapposite here. Stilkey's naming of "Stanley" as his original supplier was the polar opposite of an attempt to conceal the conspiracy between the two men.

The government's last two theories as to how Stilkey's April 22 statements tended to further the charged conspiracy are equally unpersuasive. The first of these revolves around Shafir's comment that "we'll deal with Stanley you know later when he gets [expletive deleted] back," and Stilkey's affirmative response. The government asserts that a factfinder could infer from this exchange that Stilkey expected the conspiracy to resume after the appellant returned from Florida. This is wishful thinking: the overall tenor of the April 22 conversation suggests that Stilkey was expressing his desire to exact revenge on the appellant, not to resuscitate a failed relationship. Seen in this light, the government's interpretation of the isolated exchange quoted above is plainly unreasonable.

Finally, the government argues that Stilkey's statements furthered the conspiracy by imposing discipline upon an errant coconspirator, i.e., that Stilkey diverted business away from the appellant in order to punish him for cheating their customers by supplying low-quality, short-weight drugs.

At least one court of appeals has concluded that Rule 801(d)(2)(E)'s "in furtherance" requirement may be satisfied by

statements that reasonably can be construed as imposing discipline upon wayward coconspirators.  See United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991).  But that holding rests, in material part, on a finding that the statements were intended to warn other members of the conspiracy of the ultimate consequences of falling out of line.  Id.  Here, however, nothing in the record even remotely hints that the appellant ever learned about Stilkey's attempt to steer Shafir to a new supplier.  In the absence of any such evidence, the government's discipline-based theory cannot succeed.

To say more on this point would be supererogatory.  For the reasons recounted above, we hold that the district court clearly erred in finding that Stilkey's April 22 statements tended to further the charged conspiracy.  Accordingly, the statements constituted inadmissible hearsay and should have been excluded.

### D. **Harmless Error**.

We have concluded, to this point, that the April 22 conversation between Stilkey and Shafir was improvidently allowed into evidence, but that no error attended the admission of the conversations captured on the six other audiotapes.  The question thus becomes whether the erroneous admission of the April 22 conversation requires a new trial.

A non-constitutional evidentiary error is harmless (and, therefore, does not require a new trial) so long as it is highly

-17-

probable that the error did not influence the verdict.[5]  United

States v. Trenkler, 61 F.3d 45, 60 & n.22 (1st Cir. 1995); United

States v. Ladd, 885 F.2d 954, 957 (1st Cir. 1989).  Under this

test, the government bears the burden of establishing harmlessness.

United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997).

Because the inquiry is fact-specific, each case must be treated

separately.  As we have written:

> There is no bright-line rule for divining when
> particular errors that result in a jury's
> exposure to improper evidence are (or are not)
> harmless.         Rather,    a    harmlessness
> determination demands a panoramic, case-
> specific inquiry considering, among other
> things, the centrality of the tainted
> material, its uniqueness, its prejudicial
> impact, the uses to which it was put during
> the trial, the relative strengths of the
> parties' cases, and any telltales that furnish
> clues to the likelihood that the error
> affected the factfinder's resolution of a
> material issue.

Sepulveda, 15 F.3d at 1182.

Here, the appellant asserts that Stilkey's April 22

statements go to the heart of the matter and that the government's

case, stripped of those statements, collapses like a ruined

---

[5]To the extent that our decision in United States v. Awon, 135
F.3d 96, 101 (1st Cir. 1998), implies that a non-constitutional
evidentiary error must be shown to be harmless beyond a reasonable
doubt, it is not good law.  The Awon court apparently embraced that
standard in reliance upon our decision in United States v. Lombard,
72 F.3d 170, 187 (1st Cir. 1995).  But Lombard — unlike Awon and
unlike this case — involved a purported violation of the
Confrontation Clause (and, therefore, the alleged error had a
constitutional dimension).  See id.

-18-

soufflé.  To highlight the importance of the erroneously admitted evidence, he points to the final portion of the prosecutor's closing argument.  There, the prosecutor, referring to the fact that the seven secretly recorded audiotapes were to be sent to the jury along with a Panasonic tape recorder, stated:

> The best witness in this case, ladies and gentlemen of the jury, is Mr. Panasonic.
>
> What I ask you to do, if you want to get what this case is all about, if you want to really find out what was going on back in April of 1999, go back in the jury room during your deliberations and pay attention to everything you recall, everything you can that you heard during the course of this trial, harken to some particularity, listen closely to Mr. Panasonic.  And the answer is right in front of you.

It is always dangerous to focus on rhetorical flourishes at the expense of the big picture.  Cf. Christoph Martin Wieland, Musarion (1768) (reprinted in John Bartlett, Familiar Quotations, 380:4 (Emily Morison Beck, ed., 15th ed. 1980)) (warning against a failure to "see the forest for the trees").  The appellant's argument runs afoul of this precept.  Notwithstanding the hyperbole contained in the prosecutor's impassioned summation, the record shows quite plainly that the statements made during the April 22 conversation were cumulative of other evidence.  Accordingly, their admission constituted harmless error.  We explain briefly.

At trial, the government sought to establish that the appellant (1) distributed cocaine on April 13, and (2) conspired

with Stilkey to traffic in drugs during April 1999. The government's case was very strong. Stilkey's testimony made out the essential elements. He testified that on three separate occasions — April 8, 13, and 20 — he handed the appellant money, received cocaine, and proceeded to effect a retail sale. He also vouchsafed that these transactions were within the purview of a drug-trafficking scheme hatched by the two men. This, then, was the foundation of the government's case.

The government built on this foundation throughout the trial, corroborating Stilkey's testimony in a myriad of ways. One way was through the testimony of Shafir, who gave a detailed account of his drug purchases on April 13 and April 20. Another was through the testimony of Jennifer Stilkey, who testified that the appellant was at the Stilkey residence on the afternoon of April 13; that he balked when Stilkey mentioned that the prospective customer (Shafir) wanted "to try [the cocaine] first"; and that, when Stilkey gave him the money that Shafir had paid, he counted it. A third source of corroboration was the eye-witness testimony of two detectives who functioned as members of the surveillance team. These witnesses provided cogent circumstantial evidence that Stilkey met with the appellant, as he had claimed, on April 8 and April 13.

Last — but surely not least — the six properly admitted audiotapes contained statements that not only bolstered Stilkey's

trial testimony but also furnished independent evidence of the appellant's guilt. To cite one example, Stilkey told Rodney on April 8 that his supplier — "Stanley" — traveled to New Hampshire to purchase drugs. The jury certainly could have credited Stilkey's trial testimony that "Stanley" was Stanley Piper (the appellant), especially since Jennifer Stilkey testified that the appellant mentioned that he had purchased cocaine from a New Hampshire supplier. To cite another example, Stilkey told Shafir on April 13 that his source had agreed to show up at Stilkey's house that evening at 6:00 p.m. When linked with the testimony of several witnesses who placed the appellant at the Stilkeys' home on April 13, this statement was highly probative.

It would serve no useful purpose to recount other examples. The short of it is that the details related by Stilkey about his source in the six properly admitted conversations were internally consistent, jibed with the other evidence in the case, and functioned to identify the appellant and place him at the center of the charged conspiracy.

Against this backdrop, the statements made by Stilkey on April 22 do not seem to add very much to the mix. The most damning aspect of that conversation was Stilkey's clear identification of "Stanley" as his original drug source — yet he had made the same identification in the secretly recorded conversation of April 8, and that identification was already before the jury. Moreover,

Stilkey, from the witness stand, had made an unambiguous identification of the appellant as his original supplier, and the other evidence in the case tended to verify Stilkey's claim. In the last analysis, then, the most powerful aspect of the April 22 conversation was merely cumulative of other identity-related evidence adduced by the government. Cumulative evidence is typically regarded as harmless, see, e.g., Sepulveda, 15 F.3d at 1182 (concluding that an erroneously admitted hearsay statement identifying defendant as malefactor was harmless because it was cumulative of other identity-related evidence); People of Terr. of Guam v. Ignacio, 10 F.3d 608, 614 (9th Cir. 1993) (similar), and there is no sound reason to doubt its harmlessness here.

Nor do we believe that the prosecutor's "Mr. Panasonic" reference is a particular cause for concern. That soliloquy was part and parcel of the government's rebuttal to the appellant's closing argument, which strenuously attacked Stilkey's credibility. By emphasizing the collective importance of the taped statements, the government sought to rehabilitate its witness. For this purpose, the six properly admitted tapes bore much of the load; the April 22 conversation, in and of itself, was of no special import.

That ends this aspect of the matter. Given the overwhelming evidence indicating that the appellant was Stilkey's original supplier, we deem it highly unlikely that the improvident admission of the April 22 conversation had a significant impact on

-22-

the jury's evaluation of the evidence or contributed in any way to the jury's verdict.  It follows that the error was harmless.

## III.  SUFFICIENCY OF THE EVIDENCE

The appellant's final argument is that the government failed to adduce sufficient evidence of his guilt.  From what we already have written, see supra Part II(A) & (D), it is clear that this argument is a non-starter.  We therefore treat it in an abbreviated fashion.

When, as now, a convicted defendant contests the sufficiency of evidence adduced at trial, "we must take that evidence in the light most favorable to the government and decide whether that evidence, including all plausible inferences extractable therefrom, enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime."  United States v. Barnes, 244 F.3d 172, 175 (1st Cir.) (citation and internal quotation marks omitted), cert. denied, 122 S. Ct. 379 (2001).  In conducting this analysis, we are cognizant that the government may satisfy its burden of proof "by either direct or circumstantial evidence, or by any combination thereof." United States v. Gifford, 17 F.3d 462, 467 (1st Cir. 1994). Moreover, an inquiring court is, for this purpose, constrained to "resolve all credibility disputes in the verdict's favor."  United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995).  At the end of the day, the court "need not believe that no verdict other than a

-23-

guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record." United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001) (citations and internal quotation marks omitted).

These benchmarks are easily surpassed here. As said, the government lodged two charges against the appellant. The first charge required the government to establish beyond a reasonable doubt that he knowingly and intentionally transferred cocaine from himself to someone else on April 13, 1999. See 21 U.S.C. § 841(a)(1). The second charge required the government "to show beyond a reasonable doubt that a conspiracy existed and that [the] defendant agreed to participate in it, intending to commit the underlying substantive offense." Sepulveda, 15 F.3d at 1173; see also 21 U.S.C. §§ 841(a)(1), 846.

Stilkey's testimony, in and of itself, was sufficient to establish these elements. Furthermore, that testimony was corroborated in important respects by Jennifer Stilkey, Shafir, the members of the surveillance team, and the six tape-recorded conversations that were appropriately admitted into evidence.

To be sure, the appellant argues vehemently that, notwithstanding this corroboration, Stilkey's testimony lacked credibility. In the context of a sufficiency-of-the-evidence challenge, however, such an argument is unavailing. Except in the most singular of circumstances, trial courts are not empowered to

make independent judgments about witness credibility in passing upon sufficiency-of-the-evidence challenges.  See United States v. Franky-Ortiz, 230 F.3d 405, 407 (1st Cir. 2000); United States v. Ortiz de Jesus, 230 F.3d 1, 6 (1st Cir. 2000); Lara, 181 F.3d at 204.  There is no basis here for making an exception to this well-settled rule.

## IV.  CONCLUSION

We need go no further.  To recapitulate, we hold that the district court appropriately admitted six of the seven disputed audiotapes under Evidence Rule 801(d)(2)(E).  Although the seventh — the April 22 audiotape — did not further the charged conspiracy and ought to have been excluded, we are fully persuaded that the error in admitting that audiotape was benign.  Moreover, the properly admitted evidence preponderated in favor of, and was more than adequate to support, the jury verdict.

**Affirmed**.

## **APPENDIX**

This appendix delineates the seven tape-recorded conversations introduced by the government at trial.

| No. | Date | Participants | Mode |
|-----|------|--------------|------|
| 1 | April 8, 1999 | Stilkey and Rodney | face-to-face |
| 2 | April 13, 1999 | Stilkey and Shafir | face-to-face |
| 3 | April 13, 1999 | Stilkey and Shafir | face-to-face |
| 4 | April 15, 1999 | Stilkey and Shafir | telephone |
| 5 | April 20, 1999 | Stilkey and Shafir | telephone |
| 6 | April 20, 1999 | Stilkey and Shafir | telephone |
| 7 | April 22, 1999 | Stilkey and Shafir | telephone |