DECISION
Before this Court is Defendant Jonathon Oster's Motion in Limine Regarding Alleged Co-conspirator Admissions. The State objected to the initial motion, and has, per order of this Court, proffered evidence at a pretrial hearing to support the admissibility of certain statements under the Rhode Island Rules of Evidence 801(d)(2)(E). For the reasons stated herein, this Court has determined that all but one set of statements within the State's presentation are admissible under the hearsay exception for co-conspirator statements.
 I Facts Travel
On November 2, 2007, Defendant Oster filed a motion requesting this Court to conduct an evidentiary hearing prior to the State's presentation of certain out of court statements to determine whether the statements are admissible under Rule 801(d)(2)(E). The State objected, citing U.S. v. Ciampaglia, 628 F.2d 632 (1st Cir. 1980), and suggested that the evidence be admitted at trial and a warning be given to the jury should the Court later determine that the evidence was not, in fact, admissible under the exception. Relying uponBourjaily v. United States, 483 U.S. 171 (1987), and State v.Oliviera, 882 A.2d 1097 (R.I. 2005), this Court concluded that the determination of the admissibility of an out of court statement under Rule 801(d)(2)(E) must be resolved prior to its introduction to the jury. To balance fairness and *Page 2 
caution, this Court ordered the State to alert the Court throughout trial when it intended to bring in co-conspirator evidence. To address issues of case management and allow for the most productive use of a continuance granted on December 6, 2007, the parties agreed that some 801(d)(2)(E) matters may be addressed in the week immediately preceding trial. On January 17 and 18, 2008, this Court heard oral argument as to certain evidence the State sought to admit under the exception.
 II Legal Standard Analysis
Rule 801(d)(2)(E) of the Rhode Island Rules of Evidence states, "[a] statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." It is well-settled that the proponent of the co-conspirator statements must establish three foundational elements before the statements may be admitted. A statement must be (1) made by a person who is the party's co-conspirator (or joint venturer) (2) made "in furtherance of the conspiracy," and (3) made while the conspiracy is ongoing. R.I.R. Evid. 801(d)(2)(E), Advisory Committee Notes (citing Krulewitch v. U.S., 336 U.S. 440, 442-443
(1949)).
With respect to applying Rule 801(d)(2)(E), it has been established that "[t]o invoke this exception, `the proponent of the statement bears the burden of establishing, by a preponderance of the evidence, that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." United States v. Piper, 298 F.3d 47, 52 (1st Cir. 2002). In considering whether the proponent of the statement has met this burden, it is acceptable for this Court to consider the proponent's evidence by proffer. In fact, under Rule 104, the Court may consider any evidence whatsoever, bound *Page 3 
only by the laws of privilege. United States v. Rivera-Santiago,872 F.2d 1073, 1092 (1st Cir. 1989).
At oral argument on this matter, there was some dispute as to whether the content of the co-conspirator statement itself could be used to support the State's burden of proof, and if so, what extrinsic evidence was required in addition to the statement. In U.S. v. Bourjaily, a seminal case on the matter, the United States Supreme Court stated, "[w]e think there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy."483 U.S. 171, 180 (1987). This Court finds that the question as to whether the content of the statement may be considered is resolved by that case. However, the preponderance of evidence required for the introduction of an out-of-court statement under Rule 801(d)(2)(E) must necessarily comprise more than the weight of the statement itself. U.S. v.Portella, 167 F.3d 687, 703 (1st Cir. 1999). The defense counsel in this matter contended that the standard should be interpreted in a way that emphasizes the need for additional extrinsic evidence. This concern regarding emphasis is well-founded. The case law in this jurisdiction has left open the question of the extent of extrinsic evidence necessary. Portella, 167 F.3d at 703. Although no clear guidelines are provided, it is clear that there must be at least "some proof aliunde" to demonstrate the existence of the conspiracy during and in furtherance of which the statement was made in order for the statement to be considered or admitted under 801(d)(2)(E). U.S. v.Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993).[1]
Because of the secretive nature of the crime of conspiracy, the law recognizes that the agreement may be express or tacit, and may be proven by circumstantial as well as express evidence.Rivera-Santiago, 872 F.2d at 1079. "[A] common purpose and plan may be inferred *Page 4 
from a development and collocation of circumstances." Id. Therefore, such evidence as association and proximity may offer support for the foundational requirement of proving the existence of a conspiracy. Although merely persuasive authority, the 8th Circuit has found that "[o]nce the existence of a conspiracy is established, even slight evidence connecting the defendant to the conspiracy may be sufficient proof of his involvement in the scheme." U.S. v.Schmaltz, 562 F.2d 558, 560 (8th Cir.1977).
In addition to accepting circumstantial evidence from the State, the Court may also consider evidence that is not individually substantial. The State may rely upon evidence which, standing alone would be insufficient or unreliable, but taken together and corroborated is sufficient. See Bourjaily, 483 U.S. at 180-181. The defense counsel in this matter contended that "pyramiding inferences" was impermissible; if one fact is ambiguous, the State cannot build upon it with other ambiguous facts to meet its burden. While it is true that pyramiding inferences is insufficient to meet a preponderance of the evidence burden in certain circumstances, the case law offered by the defense demonstrates this rule in the context of proving causation in a civil tort trial. See Waldman v. Shipyard Marina, 102 R.I. 366, 370-371 (R.I. 1967). Such circumstances may be distinguished from those presented in a pretrial evidentiary hearing. Furthermore, it has been specifically established within the 1st Circuit that in conspiracy cases in general, "[t]he government need not exclude every reasonable hypothesis inconsistent with guilt with respect to each piece of circumstantial evidence. . . .[r]ather, the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient. . . ." U.S. v. O'Campo, 973 F.2d 1015, 1019
(1st Cir. 1992).
In addition to proving the existence of a conspiracy that embraced the defendant and the declarant, the proponent of the co-conspirator statement must also show that the statement was *Page 5 
made "in furtherance of the conspiracy." There is no precise formula for determining whether this foundational element has been met. U.S. v.Piper, 298 F.3d 47, 54 (1st Cir. 2002). In general terms, however, "a coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy." Id.
Finally, the proponent of the evidence must show that the conspiracy was ongoing at the time the statement was made. The law in Rhode Island follows the federal interpretation in this respect. A statement made once the objectives of the conspiracy have either been achieved or failed, or made after the conspiracy has disbanded does not meet this standard. See State v. Patriarca, 112 R.I. 14, 308 A.2d 300 (1973);State v. Burke, 574 A.2d 1217 (R.I. 1990). Likewise, statements made prior to the formation of the conspiracy are outside the scope of 801(d)(2)(E).
 III Discussion
The State has set forth several sets of co-conspirator statements that it intends to bring as part of its case-in-chief. The parties differ as to the context in which they believe this Court should consider each statement. The defense contends that because there were two conspiracy counts in the indictment,[2] the State must meet the foundational burden under Rule 801(d)(2)(E) for each conspiracy before any statement made during that alleged conspiracy may be admitted. Under the defense's view, this Court could not consider the extrinsic evidence of one conspiracy to support the other. The State, however, contends that the conspiracies may be considered together, and their extrinsic evidence may be shared. This assertion is supported by the theory *Page 6 
that "[a] single conspiracy is proved if the evidence sufficiently shows `that all of the alleged conspirators directed their efforts towards the accomplishment of a common goal or overall plan," and the fact that every defendant did not participate in every transaction "does not transform a continuing plan into multiple conspiracies."Rivera-Santiago, 872 F.2d at 1079; see also U.S. v. Mena-Robles,4 F.3d 1026 (1st Cir. 1993).
The law provides that the "question of whether there is a single or multiple conspiracy is one of fact for the jury."Rivera-Santiago, 872 F.2d at 1079. This Court need not determine whether the conspiracy counts effectively separate the Defendant's involvement into two separate conspiracies, or whether the overall goal of obtaining a bribe for the HH Screw property unifies the counts into one conspiracy. Such a determination is unnecessary to the current issue, as the extrinsic evidence provided by the State for the statements within each alleged conspiracy are sufficient to meet the preponderance standard without relying upon the evidence of the other conspiracy. Therefore, without deciding whether one conspiracy or multiple conspiracies existed, this Court will address each set of statements and assess the evidence to support the required foundational elements.[3]
For organizational purposes, the evidence is described with respect to the first and second conspiracy counts.
 A First Conspiracy
The State Seeks to Admit:
• A Conversation Between Robert Picerno and Robert Campellone inJanuary 2001
The State intends to bring evidence of a conversation between Robert Picerno (Picerno) and Robert Campellone (Campellone) that took place on January 11, 2001. Campellone was a car *Page 7 
dealer in Lincoln. Picerno contacted Campellone and represented to him that he could purchase the HH Screw property for a bargain price. Picerno stated to Campellone that "$25,000 will settle the deal." During their meeting, Campellone inquired as to the time frame of the transaction, and Picerno responded "we can't move too quickly; my guy's only been in ten days." It is the State's position that the "guy" is Defendant Oster.
As extrinsic evidence to support the existence of a conspiracy between Oster and Picerno at the time this statement was made, the State details the associational relationship between Oster and Picerno. Prior to January 2001, Picerno was deeply involved with fundraising and campaigning for Oster. Once Oster was elected Town Administrator, Picerno was given an office next door to him. As described by the State, the offices held by the alleged co-conspirators were contained in close proximity within a wing of the building. Picerno further acted as a member of Oster's transition team — a position that extended for several months. Picerno maintained an office in the building after that point in time, and continued to aid Oster with interviewing staff personnel, and other work. This evidence supports an inference that Picerno and Oster were in close association, and working under conditions that would foster a conspiratorial relationship.
The State further proffers that Campellone, frustrated with the slow progress of the deal, contacted Oster directly. In that phone call, which occurred in June 2001, Oster stated with respect to the deal, "Bobby is not lying to you." It is the State's position that after this phone call, the deal began to move quickly: Picerno brought a letter to Campellone to sign regarding his interest in the property, and Oster prepared tax documents and argued to the Town Council that the deal should be accepted. *Page 8 
The defense contends that there is countervailing evidence to show that Oster was unaware of any deal between Picerno and Campellone. The defense posits that another Town official, Steven Krieger (Krieger), aided Oster in preparing the tax documents, and inquired as to Picerno's role in the deal. Oster stated that he knew nothing regarding Picerno's involvement, and speculated about the possibility that Picerno might be involved in a side deal.
The State combats this assertion with evidence to support an inference that Oster must have known about the deal. The close relationship between Picerno and Oster and the fact that Picerno sold Oster's fundraising tickets to Campellone undermine the likelihood that Oster was unaware of Picerno's involvement. Furthermore, after the election, Picerno brought Oster to meet Campellone. Finally, Campellone will testify that he dealt exclusively with Picerno prior to making the phone call to Oster in June. Therefore, if Oster could assure Campellone that Picerno was not lying, he had to be aware of Picerno's involvement in the deal prior to that time.
With respect to the first conspiracy, the State has proffered extrinsic evidence in addition to the content of the co-conspirator statements to support a series of inferences culminating in a conclusion that a conspiracy existed between Picerno and Oster with regard to the sale of HH Screw property to Campellone. While the evidence supporting the existence of the conspiracy at the time the statement was made is predominantly circumstantial, after reviewing the evidence in whole, this Court is persuaded that the State has met its burden of proof by a preponderance of the evidence. There is no dispute that these statements were made in furtherance of the conspiracy.
 B Second Conspiracy
The State Seeks to Admit: *Page 9 • Statements Made by Picerno to David Wayne Daniel and Robert Gelfuso in Mid-2001.
 • Statements Made by Picerno to David Wayne Daniel and Robert Gelfuso in Wiretapped Conversations Conducted at Shayna's Restaurant and Stuffies Restaurant between October and December 2001.
With respect to the second conspiracy, the State contends that the associational evidence continued to exist between Picerno and Oster at the time representations were made to David Wayne Daniel (Daniel) and Robert Gelfuso (Gelfuso) regarding the HH Screw Property. Picerno continued to maintain an office in Town Hall, and had access to what may have been a private entrance in Oster's personal office.[4] The State further established the factual background for these statements. According to the State, Daniel and Gelfuso, working together as Major Construction, had been hired by the Town to complete what is known as the "Fairlawn Park Project" (a project to revive a town park by adding walkways and child-accessible amenities). In mid-2001, Oster began to pressure Daniel and Gelfuso to expediate their progress on the project. Oster called Daniel into his office three consecutive Fridays to complain about this lack in progress. In one such meeting with Oster, Daniel told him "I want to be on your team." Oster did not respond to this statement. However, on the Monday immediately following, Picerno arrived at the construction site and offered to sell Daniel $5,000 worth of fundraising tickets. These proffers support an inference that Oster and Picerno were working together to pressure Major Construction so as to profit. Gelfuso, upon learning of the sale of the fundraising tickets, insisted that the funds be returned.
Shortly after this exchange, Daniel asked Picerno what it would take to "get Oster off his back." The State seeks to admit as evidence Picerno's response, in which he describes the HH Screw deal. As additional extrinsic evidence to support the existence of a conspiracy, the State *Page 10 
addresses the fact that after this exchange, the pressure Oster had asserted on Daniel and Gelfuso ceased. Oster further commended Daniel on a job well done with the site.
With respect to the pressure the State claims Oster initially placed on Daniel by calling him into his office, the defense contends that Oster was merely doing his job. The defense avers that this evidence fails to support an inference that Picerno and Oster conspired to solicit a bribe from Daniel. However, the State argues that this is not common practice — while Oster might appropriately check on the progress of a project, calling Daniel into his office every week was an extreme.
This Court has considered the associational elements in concert with the weekly meetings. It has considered the extrinsic evidence of Daniel's suggestion that he wished to join Defendant's team and the close time frame in which Picerno approached Daniel to sell campaign tickets. Finally, it has considered the dramatic change in Oster's reaction to the progress of the Fairlawn Park Project immediately following Daniel's interest in the HH Screw property. Viewing this evidence together, the Court is persuaded that the State has met its burden of proving a conspiracy involving Oster and Picerno with regard to soliciting a bribe from Daniel and Gelfuso by a preponderance of the evidence. There is no dispute that these statements were made in furtherance of the conspiracy.
The extrinsic evidence described above also provides the foundation for the later wiretapped conversations at Shayna's and Stuffies. In the first conversation, which occurred October 12, 2001, Gelfuso requested payment of $99,000 from Picerno for the Fairlawn Park Project. Picerno represented that he could assist in this matter, and referred specifically to Oster. As additional evidence, the State proffers that Gelfuso was called to meet with Oster three days after *Page 11 
this conversation. In that meeting, Oster allegedly threw the check for the balance on the Fairlawn Park Project at Gelfuso and stated "there's nothing going on in this Town."
The extrinsic evidence further supports the foundational requirements for the next recorded conversation, which took place on October 30, 2001. During that conversation, Gelfuso thanked Picerno for getting him paid, and Picerno responded, "I can get things done." Subsequently, Picerno accepted a $105,000 check and $20,000 in cash from Daniel.[5]
Picerno had these payments, along with the tax title transfer documents that had been prepared by Oster and Krieger in his possession at the time he was arrested. This evidence supports the inference that Oster had furnished Picerno with these documents in anticipation of the transfer and acceptance of bribe money.
The defense contends that Oster was not a party to the deal between Picerno, Daniel and Gelfuso. Oster indicated in a later conversation with Picerno that he was not aware of the identity of the persons providing the funds for the HH Screw property. This evidence, however, is insufficient to undermine the State's foundational proof. It is not necessary for the government to prove that the defendants knew all of the details of the conspiracy and the participation of others. All that is required is to show "the essential nature of the plan and their connections with it." Rivera-Santiago, 872 F.2d at 1079; see also U.S.v. Schmaltz, 562 F.2d 558, 560 (1977) (stating, "[i]n order to convict a defendant of conspiracy, it is not necessary to prove that he knew all of the conspirators or that he was aware of all details of the conspiracy. A showing that the defendant knowingly contributed efforts in furtherance of it is sufficient").
Taking all the evidence together, this Court is persuaded that the State has proven by a preponderance of the evidence that a conspiracy existed between Oster and Picerno at the time *Page 12 
Picerno's statements were made. There is no dispute that the statements were made in furtherance of the conspiracy. Therefore, as a preliminary matter, the conversations within the Daniel/Gelfuso conspiracy are admissible under Rule 801(d)(2)(E).
 C Post-Arrest Evidence
The State Seeks to Admit:
• February 16, 2002 Wiretap Evidence (Conversation between Oster andPicerno)
This audio/video recording took place after Picerno's arrest. Thus, it is clear that the statements made by Picerno on this date do not qualify as co-conspirator statements, and, while they may be otherwise admissible under the rules of evidence,[6] they are not admissible under the 801(d)(2)(E) exception. To fall within the scope of the exception, the conspiracy must be "ongoing" when the statement is made. Therefore, a statement made once the objectives of the conspiracy have either been achieved or failed, or made after the conspiracy has disbanded does not meet this standard. See State v. Patriarca,112 R.I. 14, 308 A.2d 300 (1973); State v. Burke, 574 A.2d 1217 (R.I. 1990). Once Picerno was arrested, his participation in the conspiracy effectively ended and his statements from that point on cannot be used against any former co-conspirator under 801(d)(2)(E). See Wong Sun v. UnitedStates, 371 U.S. 471, 490 (U.S. 1963) (stating, "[a]n out-of-court declaration made after arrest may not be used at trial against one of the declarant's partners in crime. While such a statement is `admissible against the others where it is in furtherance of the criminal undertaking . . . all such responsibility is at an end when the conspiracy ends.'" (citations omitted)). *Page 13 
 Conclusion
This Court has reviewed the State's proffers under the standard of Rule 801(d)(2)(E). As a preliminary matter, the evidence obtained after Picerno's arrest is not admissible under Rule 801(d)(2)(E). All other statements listed by the State within this motion fall within the 801(d)(2)(E) co-conspirator exception to hearsay, and the State has met its foundational burden by a preponderance of the evidence as to these statements. These statements are therefore admissible. This Court reserves the ability to exclude the statements at trial should the evidence presented to the jury differ substantially from what has been proffered.
Counsel shall prepare appropriate order for entry.
[1] Some Circuits, relying on Bourjaily, have determined that "there need only be some independent evidence linking the defendant to the conspiracy. . . .Such independent evidence may be sufficient even when it is not `substantial.'" U.S. v. Lopez-Gutierrez, 83 F.3d 1235, 1242
(10th Cir.1996).
[2] Count 2 of the indictment charges Defendant with conspiring with Picerno between January 1, 2001 and August 11, 2001 to solicit a bribe from Robert Campellone. Count 4 of the indictment charges Defendant with conspiring with Picerno between August 1, 2001 and February 16, 2002 to solicit a bribe from David Wayne Daniels and Robert Gelfuso.
[3] This Court will refer to proffered evidence and facts in general description. The specific details will be evaluated by the jury at trial.
[4] The defense contends that this door was open to all employees, and was kept open because of Oster's smoking habit.
[5] Previously, Daniel and Picerno had met at a Kent County restaurant where Daniel paid Picerno a $15,000 check for "legal fees." The payee on the check was left blank, and eventually filled in with Campellone's name. This check was used to repay Campellone for his initial payment on the HH Screw property.
[6] The State contends that Picerno's statements on this tape qualify as "adoptive admissions" under R.I.R. Evid. 801(d)(2)(A). As this Court has determined that a motion in limine is not the appropriate vehicle for addressing the admissibility of this evidence, this matter need not be addressed until it is raised in the context of trial.