# United States Court of Appeals
## For the First Circuit

No. 02-2219

UNITED STATES,

Appellee,

v.

MICHAEL S. FLEMMI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

John H. LaChance for appellant.
Brian T. Kelly, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, and Virginia M.
Vanderjagt, Assistant United States Attorney, were on brief, for
appellee.

March 25, 2005

**STAHL, Senior Circuit Judge.** Appellant Michael Flemmi ("Michael") is a retired Boston police officer and the brother of gangster Stephen Flemmi ("Stephen"). Until Stephen's arrest in 1995 and subsequent incarceration, he and James Bulger ("Bulger") ran a criminal enterprise in Boston (the "Bulger/Flemmi group").

In 2000, Michael was indicted and charged with two counts of obstruction of justice, in violation of 18 U.S.C. § 1503; one count of perjury, in violation of 18 U.S.C. § 1623; one count of possession of unregistered machine guns, silencers, and cut-down shotguns, in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), 5871; and one count of transfer and possession of machine guns, in violation of 18 U.S.C. § 922(o). The charges were based on allegations that he helped hide a cache of weapons and lied to a grand jury in an attempt to impede an investigation of his brother and other members of the Bulger/Flemmi group.

At Michael's trial, the district court allowed the jury to hear evidence relating to the Bulger/Flemmi group and Michael's interactions with that group. The jury ultimately convicted Michael on all counts. At sentencing, the district court, in calculating Michael's sentence for the perjury and obstruction of justice counts, identified murder as the most serious offense related to his unlawful conduct. On appeal, Michael argues that the district court erred in admitting the abovementioned evidence and identifying murder as the relevant offense. We affirm.

-2-

## I.  Background

In November 1999, Kevin Weeks ("Weeks"), a member of the Bulger/Flemmi group, was arrested and indicted (the "Weeks indictment") by a grand jury in Worcester, Massachusetts (the "grand jury").[1]  Soon after his arrest, Weeks agreed to cooperate with the government and disclosed information about crimes committed by the Bulger/Flemmi group.  Weeks stated that Bulger and Stephen had committed three previously unsolved murders and buried the bodies at a specified location in Dorchester, Massachusetts.[2]  Weeks also said that the Bulger/Flemmi group had an arsenal of weapons (guns and ammunition) hidden in a structure behind the house of Michael and Stephen's mother, Mary Flemmi ("Mrs. Flemmi"), in Boston, Massachusetts.  As a result of the information that Weeks provided, the grand jury amended the Weeks indictment to include Bulger and Stephen, who were each charged with engaging in violent racketeering activities, including assault and murder.[3]

Thereafter, law enforcement agents obtained warrants to search for the weapons and bodies Weeks had described.  On January 13, 2000, agents searched the structure behind Mrs. Flemmi's house

---

[1]Weeks was charged with engaging in a variety of criminal offenses, including extortion and money laundering.

[2]Weeks acknowledged that he had witnessed the murders.

[3]Bulger and Stephen had previously been indicted in 1995 (the "1995 indictment") for engaging in similar racketeering activities, including murder.

for the arsenal and, in a secret compartment within the structure, found a single revolver, along with ammunition and silencers. The hide, however, contained numerous shelves and gun racks and, thus, appeared capable of storing a substantial number of firearms. At the location Weeks identified in Dorchester, the agents unearthed the skeletal remains of three murder victims, who were subsequently identified as Arthur Barrett ("Barrett"), John McIntyre ("McIntyre"), and Deborah Hussey ("Hussey"), the latter being Stephen's step-daughter.

On January 11, 2000, two days before the agents searched the hide, William St. Croix ("St. Croix"), Stephen's son, visited Stephen in prison. During the visit, Stephen asked St. Croix to remove guns Stephen had hidden in the structure behind his mother's house. St. Croix and his friend, Michael Allen ("Allen"), went to Mrs. Flemmi's house that same day. Michael was present when they arrived. St. Croix told Michael that Stephen had asked St. Croix to remove guns from a hide in the structure because he was concerned that Weeks, whom he knew to be cooperating with the government, would disclose the existence and location of the hide. Michael helped St. Croix locate the hide and load the guns into bags, which St. Croix and Allen then transported to Allen's residence.[4]

---

[4]Some of the guns were later transported to a storage facility in Florida, while others were buried in Somerville, Massachusetts. Approximately fifty-four guns were ultimately recovered by law

<u>Michael's Grand Jury Testimony</u>

On June 7, 2000, Michael was called to testify before the grand jury, which was still investigating the Bulger/Flemmi group. Michael was questioned about the structure behind his mother's house, the hide, the missing guns, and the bodies unearthed in Dorchester. Michael told the grand jury that "the last time [he] was in [the structure] was about three years ago." When Michael was asked whether he had ever seen the hide, or the items recovered therefrom, before the January 13, 2000 search, he responded, "Never." Michael also stated that, before January 13, 2000, he did not know about the hide; had never conversed with anyone about the hide; had never seen any firearms at his mother's house; did not know whether there were ever rifles in the hide; and did not know whose property was recovered from the hide or how it came to be situated there. Finally, when Michael was asked whether he knew if Stephen's step-daughter, Hussey, was alive, he answered, "I don't know." Yet, a few months before, in January of 2000, while he and St. Croix were visiting Stephen in prison, Stephen confessed to killing Hussey.

The grand jury subsequently added Michael to the Weeks indictment. He was charged with obstruction of justice and perjury

---

enforcement agents from the Florida storage facility and the ground in Somerville.

in connection with the removal of the guns from the hide and his grand jury testimony, and with unlawful possession of firearms.

Michael's Trial

Michael was tried separately from the other indicted parties. At his trial, which began on April 16, 2002, the government called St. Croix and Allen to testify that Michael had helped them remove guns from the hide. The government also presented evidence that the guns met the statutory requirements for the firearms charges, and it played for the jury a recording of Michael's grand jury testimony. In addition, the government was permitted to ask St. Croix and Weeks about the Bulger/Flemmi group, its criminal exploits, and Michael's contacts with the group. Nevertheless, the jury was instructed, on more than one occasion, that "Michael [was] not charged with complicity in the [crimes] carried out by the Bulger-Flemmi organization," and it was reminded that it was to "confine [its] deliberations to the crimes with which Michael [was] actually charged."[5]

---

[5]During the jury charge, the district court gave the following limiting instruction (a comparable instruction was given when St. Croix testified):

Guilt can never be established by the mere fact of association. The fact that Stephen [], a notorious gangster, is the defendant's brother does not prove anything about [Michael's] possible guilt.

You also heard testimony about the criminal organization led by Stephen [] and [] Bulger and its many crimes. This testimony was admitted to the extent that it was relevant to your understanding of the grand jury investigation that [Michael] is accused of obstructing, the origin and the purpose of the cache of firearms that

-6-

Michael's defense at trial was that he had nothing to do with the removal of the guns from the hide--he insisted that any testimony on the part of the government's witnesses to the contrary was false.  The jury ultimately convicted Michael on all counts.

Michael's Sentencing

Michael was sentenced on September 9, 2002.  In order to determine Michael's sentence for perjury and obstruction of justice, the district court had to identify the most serious substantive offense related to his unlawful conduct.[6]  The district

---

were allegedly hidden [in the structure behind Mrs. Flemmi's house], and your assessment of the credibility of certain witnesses who have admitted their participation in the organization's crimes.

You must, however, remember that Michael [] is not charged with complicity in the murders, extortions, and drug dealing carried out by the Bulger-Flemmi organization.  Not only is he not charge[d] in these crimes, there is no evidence that he was involved in them in any way.  You are, therefore, to confine your deliberations to the crimes with which Michael [] is actually charged . . . .

[6]Section 2J1.2(a) of the United States Sentencing Guidelines provides a base offense level of 12 for obstruction of justice. (The district court used the Guidelines Manuel issued on November 1, 2001, and so do we.)  But, "[i]f the offense involved obstructing the investigation or prosecution of a criminal offense," section 2J1.2(c) instructs the sentencing court to apply section "2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than" the calculation under the obstruction Guideline alone.  The Guideline for perjury, section 2J1.3, also has a base offense level of 12, and a cross-reference to section 2X3.1 "[i]f the offense involved perjury . . . in respect to a criminal offense."  Note, "the defendant need not have been convicted [of] participating in the underlying offense" for the cross-reference to apply.  E.g., United States v. Suleiman, 208 F.3d 32, 38 (2d Cir. 2000).  The accessory after the fact Guideline, section 2X3.1, provides a base

court, adopting the position taken in the United States Probation Office's Pre-Sentence Report ("PSR"), decided that the relevant offense was murder and sentenced Michael accordingly.

Present Appeal

On appeal, Michael argues that the district court erred in admitting St. Croix and Weeks' testimony about the Bulger/Flemmi group, its criminal activities, and Michael's interactions with the group. He insists that: (1) the testimony pertaining to the Bulger/Flemmi group and its criminal exploits was irrelevant and unfairly prejudicial and, as such, should have been excluded pursuant to Federal Rules of Evidence 401, 402, and 403; (2) the testimony describing his interactions with the group was unfairly prejudicial evidence of uncharged misconduct that should have been excluded under Federal Rules of Evidence 403 and 404(b); and (3) even if the district court did not err in admitting the challenged evidence for the reasons stated above, "the testimony [describing] statements made by Stephen [] to Weeks and[] St. Croix [was hearsay that was] erroneously admitted" under Federal Rule of Evidence 801(d)(2)(E). Furthermore, Michael asserts that the district

_____

offense level of "6 levels lower than the offense level for the underlying offense, but in no event less than 4, or more than 30." And, "[w]here there is more than one [potential underlying] offense, the most serious such offense . . . is to be used." U.S. Sentencing Guidelines Manual § 1B1.5, cmt. n.3 (2001).

In sum, where, as here, section 2X3.1 applies, the individual who obstructed justice or committed perjury is sentenced as though he were an accessory after the fact to the most serious substantive criminal offense related to his conduct.

court, in calculating his sentence for perjury and obstruction of justice, erred in determining that the most serious offense related to those charges was murder. We address these arguments seriatim.

## II.  Michael's Evidentiary Challenges

As a general matter, "[w]e review the district court's decision to admit the disputed evidence for abuse of discretion." United States v. McGuire, 389 F.3d 225, 228 (1st Cir. 2004); see also Richards v. Relentless, Inc., 341 F.3d 35, 49 (1st Cir. 2003) (reviewing relevancy determinations for abuse of discretion); United States v. Balsam, 203 F.3d 72, 84 (1st Cir. 2000) (reviewing rulings pursuant to Rules 403 and 404(b) for abuse of discretion). If, however, there was no objection to the admission of the evidence at trial, our review is only for plain error.[7] See United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). We will not find plain error unless "(1) [] an error occurred (2) which was clear or obvious and which not only (3) affected [Michael's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id.

A.          Evidence of the Bulger/Flemmi Group and its Exploits

We begin by evaluating the admission of the testimony concerning the Bulger/Flemmi group and its criminal exploits. Michael argues that because this testimony, which is described in

---

[7]Unless we state otherwise, it should be assumed that Michael objected to the admission of the challenged evidence below.

-9-

detail below, "was only marginally relevant, if at all," to the charged offenses and unfairly prejudicial, it should have been excluded under Rules 401, 402, and 403. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Generally, "[a]ll relevant evidence is admissible," while "[e]vidence which is not relevant is not admissible." Fed. R. Evid. 402. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."[8] Fed. R. Evid. 403. We note at the outset that "[o]nly rarely--and in extraordinarily compelling circumstances--will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Sabetta, 373 F.3d 75, 82-83 (1st Cir. 2004) (internal quotation marks omitted).

Testimony Describing Persons Involved with the Bulger/Flemmi Group

---

[8]Evidence is unfairly prejudicial if it "invites the jury to render a verdict on an improper emotional basis." United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000) (stating that a reviewing court should be "cautious when [evidence] is [] shocking or heinous [and, thus,] likely to inflame the jury" (internal quotation marks omitted)); see also United States v. Currier, 836 F.2d 11, 18 (1st Cir. 1987) ("Unfairly prejudicial evidence . . . is evidence that triggers the mainsprings of human action in such a way as to cause a jury to base its decision on something other than the established proposition in the case." (internal quotation marks and brackets omitted)).

Michael first questions the admission of St. Croix's testimony concerning individuals involved with the Bulger/Flemmi group. Specifically, he contests the admission of statements that: Stephen and Bulger "were partners in a criminal organization" (the Bulger/Flemmi group)[9]; George Kaufman and Phil Costa were members of, and collected money owed to, that organization; and Frank Salemme "was the head of the New England mafia" and Stephen's ally.

The admission of these statements was not an abuse of discretion. Michael was charged with obstructing an investigation into the Bulger/Flemmi group and these statements were relevant because they provided the jury with useful background information-- they introduced individuals associated with the investigation that Michael was charged with obstructing. See United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime."); see also United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.").

---

[9]Although Michael did not object to the admission of this particular statement at trial, we find it unnecessary to engage in the plain error analysis because we find no error in its admission.

Moreover, the testimony was not unfairly prejudicial to Michael, as St. Croix never suggested that Michael was a member of the Bulger/Flemmi group.  And, any prejudice that it may have caused was mitigated by the district court's limiting instructions.

Testimony About an "X Fund"

Michael next objects to the admission of Weeks' testimony that the Bulger/Flemmi group had an "X fund"--a fund comprised of "money that was put aside every time we made a score . . . for expenses that would come up, . . . you know . . . payoffs."  The testimony was relevant because it indicated that the members of the Bulger/Flemmi group were intent on concealing the group's criminal activities, and thus, it tended to support the government's theory that Stephen recruited St. Croix (who, in turn, recruited Michael) to remove guns from the hide.  And, any claim that the testimony was unfairly prejudicial to Michael is weak because Weeks never indicated that Michael had anything to do with the "X fund."  There was no error in the admission of this testimony.

Testimony About the Use of Coded Communications

Michael also asserts that the district court erred in admitting (1) St. Croix's testimony that, when possible, St. Croix, Weeks, Allen, and Michael avoided using intercom phones when communicating with Stephen in prison (they would, for example, hold up signs and gesture with their hands), and (2) Weeks' testimony that members of the Bulger/Flemmi group used nicknames when

-12-

referring to law enforcement agents in front of Michael and that Michael understood the coded references. This testimony was highly relevant because it indicated that Michael was a trusted ally of the Bulger/Flemmi group (such that it would not be unreasonable to think that St. Croix would have enlisted his help in moving the guns) and that he was aware of, and willing to cover up, the group's activities (which helped establish his knowledge of the group's--and his brother's--unlawful behavior, as well as his intent to commit the crimes with which he was charged). We do not think that the district court abused its discretion in admitting the testimony based on its high probative value. We also note that any danger of unfair prejudice was considerably lessened by the limiting instructions the district court gave.

Testimony About the Bulger/Flemmi Group's Criminal Activities

In addition, Michael attacks the admission of Weeks' testimony concerning: (1) the three people--Barrett, McIntyre, and Hussey--who were murdered in Weeks' presence and buried in Dorchester; (2) two others, Brian Halloran ("Halloran") and Michael Donahue ("Donahue"), who were also murdered in Weeks' presence; and (3) the Bulger/Flemmi group's unlawful acquisition of a liquor store in which Weeks was directly involved. With regard to the murder victims, Weeks gave a brief account of the circumstances

surrounding each murder.[10]   In terms of the liquor store, Weeks stated that he intimidated the owners of the store (by brandishing a gun) so they would sell the store to the Bulger/Flemmi group.

The government defends the admission of this testimony by pointing out that the testimony (which brought to the fore Weeks' extensive criminal history) was important to Weeks' credibility and arguing that such impeachment evidence may be elicited on direct examination.[11]  There is support for the government's position. See United States v. Frappier, 807 F.2d 257, 259 (1st Cir. 1986) ("[T]he prosecution, having called a witness, may then 'take the wind out of the sails' of the defense by questions eliciting possible bases for impeachment."); see also Fed. R. Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness.").  Michael even concedes that informing a jury of the nature of a witness' prior criminal conduct is "fair game."  Nevertheless, he contests the admission of Weeks'

---

[10]Weeks testified that:  Bulger and Stephen strangled Hussey (he did not explain why); Bulger shot Barrett because he had a grudge against him; and either Bulger or Stephen shot McIntyre after learning that he had informed law enforcement agents of the Bulger/Flemmi group's plans to smuggle weapons to the Irish Republican Army in Ireland.  Weeks then related a conversation that he had with Michael soon after Hussey's disappearance in which "Mi[chael] indicated . . . that [Hussey's disappearance] was no great loss."  Finally, Weeks explained that Halloran was shot by Bulger and a masked accomplice because he was an informant and that Donahue was an unintended victim of the Halloran shooting.

[11]We note and find it significant that, prior to trial, Michael could have agreed to refrain from eliciting the evidence in question on cross-examination, but that he opted not to do so.

testimony on the ground that the prejudicial effect of permitting the government to delve into the particulars of the Bulger/Flemmi group's crimes substantially outweighed the testimony's probative value.  We disagree.  Although there may be circumstances where a criminal defendant would be wronged if the prosecution were allowed to delve too deeply into the particulars of its witness' criminal history on direct, we do not think that this is such a case.  Here, all but one of the statements had significant probative value.[12]  And, there was little danger of unfair prejudice:  there was no suggestion that Michael was involved in the crimes that Weeks described and the jury was instructed to that effect.  We cannot say that the district court abused its discretion in admitting Weeks' testimony.  See United States v. Dworken, 855 F.2d 12, 28 (1st Cir. 1988) ("It is perhaps true that the government could have [made due] without so much detail concerning the prior [events],

---

[12]The value of the conversation that Weeks had with Michael after Hussey's disappearance where "Mi[chael] indicated . . . that [Hussey's disappearance] was no great loss" is not readily apparent to us.  Nonetheless, as we will later show, the error in the conversation's admission was harmless.  That conversation aside, we think the rest of Weeks' testimony was probative not only because it elicited impeachment evidence, but also because it established a motive for Michael to help remove the guns from the hide and lie to the grand jury (he did not want his brother's involvement in crimes committed by the Bulger/Flemmi group, such as those Weeks described, to be exposed), and because it provided useful background by showing the purpose of the arsenal and describing crimes that were the subject of the investigation that Michael was charged with attempting to impede, see Daly, 842 F.2d at 1388.

-15-

but this is essentially a Rule 403 balancing decision left to the broad discretion of the trial judge." (emphasis in original)).

Testimony that Weeks Sought a Gun from Stephen

The next challenge concerns Weeks' testimony that he visited Stephen in prison and asked Stephen for permission to take one of the guns from the hide so he could "act" on threats that had been made against him. According to Weeks, Stephen agreed to the request and stated that Stephen, Weeks, and Bulger were "the only ones [who] knew [about the hide]." On appeal, Michael disputes only the admission of that portion of the testimony where Weeks stated that he sought a gun to "act" on threats made against him. The challenged statement was relevant because it prompted, and provided context to, the unchallenged, and clearly relevant, testimony concerning the hide.[13] See Sabetta, 373 F.3d at 83 (recognizing that testimony is relevant if it helps "explain[] the chain of events"). Although the challenged statement's probative value may not have been particularly high, we do not see how its admission caused Michael unfair prejudice--there was no indication that Michael knew of the conversation between Stephen and Weeks or Weeks' plan to "act" on the threats made against him. Consequently, there was no error in the testimony's admission.

_____

[13]The fact that Stephen told Weeks that he could take a gun from the hide and that the only other person who knew about the hide was Bulger helped establish the government's theory that the hide was used to store a cache of guns and that the guns were in the hide when St. Croix claimed to have moved them.

-16-

Testimony Regarding a Bombing in which Stephen was Implicated

Michael also objects to the admission of St. Croix's testimony that he first "obtained personal knowledge [of Stephen's] criminal activities . . . in 1974" when he learned that Stephen had been "implicated in [a] bombing." This testimony provided relevant background to the development of the illegal relationship between St. Croix and his father, a relationship that culminated in the concealment conspiracy in question. See United States v. Santana, 342 F.3d 60, 67 (1st Cir. 2003) (noting that evidence is relevant in a conspiracy case if it explains the background of the illegal relationship). And, the naked reference to a bombing in which Stephen was allegedly implicated was not unfairly prejudicial to Michael, as there was no allegation that Michael was involved in, or knew of, the bombing. Moreover, any potential prejudice was counteracted by the limiting instructions. The district court did not abuse its discretion in admitting this testimony.

Testimony Concerning St. Croix's Relationship with Stephen

Michael further contends that it was an abuse of discretion to allow St. Croix to testify that he and Stephen agreed that if St. Croix chose a life of crime, Stephen "would show [him] how to do things and [St. Croix would] tell [Stephen] everything [he] was involved in . . . to make sure [that he] didn't hurt any of [Stephen's] friends." We disagree. Immediately after St. Croix gave the challenged testimony, he told the jury that he took his

father up on his offer and "report[ed] to him on a regular basis." Therefore, the testimony was relevant as it established the background and formation of the illegal relationship between St. Croix and Stephen, and it explained why Stephen would feel comfortable telling St. Croix about the hide and asking him to move the guns. See id. (noting that, in a conspiracy case, evidence is relevant if it explains "the background [and] formation . . . of the illegal relationship and . . . help[s] the jury understand the basis for the co-conspirators' relationship of mutual trust" (internal quotation marks omitted)). In addition, it is not clear how the testimony could have caused Michael unfair prejudice because there was no suggestion that he was in any way involved in St. Croix's life of crime.

Michael also finds fault in the admission of St. Croix's statements concerning Stephen's reaction after he learned that St. Croix's brother, Stephen's other son, refused to visit him because he was "angry" at him. According to St. Croix, Stephen said, "What the hell has he got to worry about? All he had to do was 18 months. I may spend the rest of my life in prison." Michael, however, used the testimony pertaining to the length of Stephen's prison term to his advantage when he later relied on the likelihood that Stephen would spend the rest of his life in prison in presenting his defense: In his closing argument, Michael argued that St. Croix was angry at his father for killing Hussey and that,

because he could not take direct revenge against his father, who would likely spend "the rest of his natural life" in prison, he falsely testified against Michael as an indirect way to punish Stephen. Under the circumstances, Michael can hardly complain of prejudicial error. See, e.g., United States v. Carrillo-Figueroa, 34 F.3d 33, 39 (1st Cir. 1994).

In any event, there was no error in the admission of this testimony. The testimony was relevant because it helped establish that St. Croix was upset with his father (St. Croix testified that his father's "cavalier" reaction to his brother's anger "really [] upset" him),[14] and thus, it supported Michael's defense that St. Croix falsely testified against him as a way to punish Stephen. See Frappier, 807 F.2d at 259 (stating that the prosecution may elicit possible bases for impeachment on direct). Moreover, we do not see how the testimony, which in no way reflected on Michael, could have caused Michael unfair prejudice.

Testimony that Stephen Confessed to Murdering Hussey

Michael next disputes the admission of St. Croix's testimony that, on January 20, 2000, Stephen admitted to killing Hussey in front of St. Croix and Michael. He did not object to the admission of this testimony below, and we do not find any error, much less plain error, in its admission. The testimony was highly

---

[14]The fact that St. Croix's brother was jailed for eighteen months was relevant because it explained the reason for the brother's anger towards Stephen. See Daly, 842 F.2d at 1388.

-19-

relevant because Michael was charged with, among other things, perjuring himself before the grand jury, and on June 7, 2000, subsequent to the conversation in question, he told the grand jury that he had no idea whether Hussey was alive.[15] Although the testimony was certainly damaging to Michael, the district court did not err in finding that the danger of unfair prejudice did not outweigh the testimony's probative value.

Testimony About Defense Funds

This brings us to the final piece of testimony pertinent to the Bulger/Flemmi group and its criminal exploits that Michael challenges on appeal: St. Croix's testimony about the existence of defense funds for members of the group. Despite Michael's insistence to the contrary, the district court did not err in allowing St. Croix to testify that a portion of the proceeds from the illegal activities in which he was involved were used to pay the legal expenses of Stephen and some of his associates. The testimony was relevant for impeachment purposes (its admission enabled the government to bring out on direct examination the fact that St. Croix was engaged in illegal activities), see Frappier, 807 F.2d at 259, and because it provided insight into the

---

[15]The testimony was also relevant to show that Michael knew of Stephen's past crimes, and thus, it helped establish that Michael had a motive to help move the guns and lie to the grand jury. See supra note 12. In addition, the testimony demonstrated that Stephen trusted Michael and St. Croix to the extent that it would be reasonable to believe that he asked St. Croix to move the guns and that St. Croix recruited Michael to assist in the endeavor.

relationship between St. Croix and Stephen, see Santana, 342 F.3d at 67. The district court did not abuse its discretion in finding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, because the testimony did not implicate Michael in St. Croix's illegal activities.

B.      Evidence of Michael's Interactions with the Bulger/Flemmi Group

We now consider whether the district court erred in admitting testimony pertaining to Michael's interactions with the Bulger/Flemmi group. Michael argues that this testimony constituted unduly prejudicial evidence of uncharged misconduct that should have been excluded pursuant to Rules 403 and 404(b). Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Nevertheless,

> other bad acts evidence is admissible so long as the following, two-part test is satisfied: First, in accordance with Rule 404(b), the evidence must have special relevance to an issue in the case such as [motive,] intent or knowledge, and must not include bad character or propensity as a necessary link in the inferential chain. . . . Second, consistent with Rule 403, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice.

United States v. McGuire, 389 F.3d 225, 229 (1st Cir. 2004) (internal quotation marks and citations omitted). We identify, and evaluate Michael's objections to, the relevant statements below.

Testimony Concerning Michael's Interactions with Weeks

-21-

Weeks was permitted to tell the jury that he engaged in loan sharking in Michael's presence without trepidation because Michael was "Ste[phen's] brother" and Weeks "trusted him." Weeks also testified that, after his gun license was revoked, Michael saw him with guns and, on two occasions, loaned him a gun. Weeks stated that he was not "afraid [that Michael] was going to arrest [him] for [carrying a gun without a license]." Michael objects to the admission of this testimony for the first time on appeal, and as a result, our review is for plain error.

We find no error, and therefore, no plain error, in the admission of this testimony. The government tried Michael on the theory that he lied and obstructed justice to shield members of the Bulger/Flemmi group from prosecution. Thus, the testimony had special relevance in that it demonstrated Michael's knowledge that members of the group engaged in unlawful activities and evidenced his intent[16] to protect those individuals from facing the legal consequences of their actions.[17] Moreover, we do not think that the

_____

[16]Michael's argument that the district court should not have admitted Rule 404(b) evidence to prove intent because his defense was a general denial of the crimes with which he was charged is unavailing. We have held that "[Rule 404(b)] evidence may be admitted when it is probative of an issue other than character even when the defense is a general denial of the charges." United States v. Oppon, 863 F.2d 141, 146 (1st Cir. 1988); but see United States v. Ortiz, 857 F.2d 900, 904 (2d Cir. 1988) ("When a defendant unequivocally relies on such a defense, evidence of other acts is not admissible for the purpose of proving intent.").

[17]The testimony also helped explain the trust that existed between Michael and members of the Bulger/Flemmi group. See

district court abused its discretion in balancing the probative value of this testimony against the danger of unfair prejudice.

Testimony that Michael Handled Stephen's Criminal Affairs

The next challenge involves testimony that Michael helped handle Stephen's affairs while Stephen was in prison. St. Croix testified that "after Phil Costa died and [] Weeks was indicted, [he and Michael were the only people] left to handle [Stephen's] affairs on the outside." St. Croix also testified that, after Stephen's arrest, Michael "was picking up money from various bookmakers . . . owed to [Stephen]."[18] In addition, Weeks testified that Michael "participate[d] in th[e] process of picking up [proceeds from an extortionate] sale."[19]

Michael insists that the district court should have excluded the above statements. We disagree. The statements were specially relevant not only to show that Michael had knowledge of,

---

Santana, 342 F.3d at 67.

[18]Michael did not object to the admission of this statement at trial, so our review of its admission is for plain error. However, because we do not find any error in its admission, we need not engage in the plain error analysis.

[19]Michael also objects to Weeks' statement that Weeks "collected some of the proceeds" for Stephen from the extortionate sale, a statement Weeks made immediately before testifying that Michael also picked up money in connection with the sale. We do not think that the district court erred in admitting this statement. It was relevant because it put into context Weeks' comment about Michael's involvement in the extortionate sale, and it is not clear how the statement (which itself did not implicate Michael in the sale) caused Michael unfair prejudice. See Sabetta, 373 F.3d at 83.

and occasionally assisted in, Stephen's illegal activities (which helped establish that he had a motive to engage in the crimes with which he was charged--to conceal from the grand jury his and his brother's wrongdoing, as well as the intent to do so), but also to demonstrate that while Stephen was in prison, St. Croix and Michael were among the few people he trusted to help him with his illegal activities. This explains why Stephen would feel comfortable telling St. Croix about the hide and asking him to move the guns (and why St. Croix would then feel comfortable enlisting Michael to help). See Santana, 342 F.3d at 67 (allowing the admission of Rule 404(b) evidence to explain the trust that existed among the coconspirators). Although the testimony may have caused the jury to view Michael in a negative light, we do not think that the district court erred in admitting the evidence after balancing its significant probative value against the danger of unfair prejudice.

Testimony that Michael Informed Weeks of Stephen's Arrest

Michael also contests the admission of Weeks' statement that Michael told him that Stephen had been arrested soon after the arrest. Michael's claim is unavailing. The statement had special relevance that could reasonably have been found to outweigh any danger of unfair prejudice, as it helped establish Michael's knowledge of Stephen's legal troubles and wrongdoing. Moreover, the statement was independently admissible as a necessary component of Weeks' ensuing testimony, the admission of which Michael does

not contest. Weeks testified that he responded to the news about Stephen's arrest by telling Michael, "I told [Stephen] to take off," to which Michael replied, "I know, I know." This exchange is probative of Michael's knowledge of Stephen's criminal wrongdoing and intent to obstruct justice (Michael acknowledged that he was aware that Stephen had been told to "take off" to avoid capture).

C.        Coconspirator Statements

Having disposed of Michael's claims involving the testimony of his interactions with the Bulger/Flemmi group, we turn our attention to his final evidentiary challenge, which is premised on his assertion that the district court erred in admitting all of the above testimony that describes statements Stephen made to Weeks and St. Croix because that testimony related inadmissible hearsay.[20] Michael claims that, despite the district court's apparent finding to the contrary, the statements did not satisfy the requirements of Rule 801(d)(2)(E), which provides that a statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." As an initial matter, there are only two statements made by Stephen that would even arguably constitute

_____

[20]Michael does not challenge on hearsay grounds the admission of statements made by anyone other than Stephen. Hearsay is "an oral or written assertion . . . , other than one made by the declarant while testifying at the trial . . . , offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. "Hearsay evidence ordinarily is inadmissible in criminal trials." United States v. Piper, 298 F.3d 47, 51 (1st Cir. 2002).

hearsay but for the application of Rule 801(d)(2)(E): (1) his statement to Weeks that only he, Weeks, and Bulger knew of the hide, and (2) his statement to Michael and St. Croix that he killed Hussey.[21]

To invoke Rule 801(d)(2)(E), the government "bears the burden of establishing, by a preponderance of the evidence, that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement[s] during and in furtherance of the conspiracy." United States v. Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002) (internal quotation marks omitted). A defendant who wishes to preserve for appeal a challenge to the admission of statements under Rule 801(d)(2)(E) must request, at the close of all the evidence, that the district court make a determination as to whether the government carried its burden. See

---

[21]St. Croix did not recount hearsay when he testified about the composition of the Bulger/Flemmi group because he testified from his own experiences (he did not report oral or written assertions). In addition, St. Croix did not relate hearsay when he testified that Stephen told him that if he chose a life of crime, Stephen "would show [him] how to do things." Stephen's statement was not admitted to prove the truth of the matter asserted (that Stephen would or did tutor St. Croix in crime); rather, it was an instruction admitted to provide background for the development of St. Croix and Stephen's criminal relationship. See United States v. Murphy, 193 F.3d 1, 5 (1st Cir. 1999) ("So long as out-of-court statements are not offered for their truth, they are not hearsay . . . ."). Similarly, the statements discussing the prison terms of St. Croix's brother and Stephen are not hearsay because they were not offered for the truth of the matters asserted (that St. Croix's brother spent eighteen months in prison and that Stephen would likely spend the rest of his life in prison) but, instead, for their effect on St. Croix. See United States v. DeVincent, 632 F.2d 147, 151 (1st Cir. 1980).

-26-

United States v. Ortiz, 966 F.2d 707, 715 (1st Cir. 1992).  "[A]
defendant's failure to object to the omission of such an express
trial-end determination bars him from raising the point on appeal
in the absence of plain error."  Id. (internal quotation marks
omitted).  Because the district court did not make, and Michael did
not ask for, "an express trial-end determination," our review is
for plain error.  Id.

　　　We do not think that Michael has demonstrated that the
admission of the challenged statements was error (and, ergo, he has
not shown plain error).  The government certainly established that
Michael was involved in a conspiracy with Stephen, Weeks, St.
Croix, and Allen to conceal the illegal activities of the
Bulger/Flemmi group.[22]  Nevertheless, Michael asserts that the
statements should have been excluded because there was no evidence

---

[22]For example, St. Croix testified that Michael helped St.
Croix and Allen move the group's guns from the hide after learning
that Stephen had requested their removal because he feared that a
search of the hide was imminent.  And, after providing that
assistance, Michael professed his ignorance of the hide before a
grand jury investigating the Bulger/Flemmi group.  There was also
testimony indicating that Stephen, Weeks, and St. Croix trusted
Michael to remain silent about the group's exploits:  Weeks
testified that he openly conducted illegal activities on behalf of
the Bulger/Flemmi group in front of Michael; and Weeks and St.
Croix testified that Michael helped collect illegal debts for
Stephen while Stephen was in prison.
　　Michael argues that because the district court stated that he
was not involved "in the murders, extortions, and drug dealing
carried out by the Bulger-Flemmi organization," he could not have
been a coconspirator.  However, the fact that Michael was not
involved in the organization's "murders, extortions, and drug
dealing" does not mean that he was not a participant in a
conspiracy to conceal its criminal acts.

-27-

that he was a coconspirator "at the time" they were made. But, whether Michael was a coconspirator at the time the statements were made is irrelevant--we have held that an individual who joins a conspiracy "at a later date, . . . effectively adopt[s] coconspirator declarations previously made." United States v. Saccoccia, 58 F.3d 754, 778 (1st Cir. 1995).

In addition, Michael claims that the statements were not made in furtherance of the conspiracy, but that claim also fails. "[A] coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy." United States v. Piper, 298 F.3d 47, 54 (1st Cir. 2002). Stephen's statement to Weeks that Stephen, Weeks, and Bulger were the only people who knew of the hide furthered the conspiracy because it informed a coconspirator (Weeks) of those with knowledge of the hide, which was important to ensure that the knowledge remained contained. Likewise, Stephen's statement to Michael and St. Croix (in response to a direct question from St. Croix) that he killed Hussey furthered the conspiracy because it fostered a relationship of trust among the three, and it kept Michael and St. Croix "abreast of current developments and problems facing the group," United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotation marks omitted).

D.        Harmless Error

We conclude our evidentiary discussion by noting that the one error we have identified, see supra note 12, was harmless and, as such, does not merit reversal of the jury verdict.  It is settled that "[a] non-constitutional evidentiary error is harmless (and, therefore, does not require a new trial) so long as it is highly probable that the error did not influence the verdict." Piper, 298 F.3d at 56.  Here, that standard is met.  This is because the jury was presented with ample direct evidence that Michael obstructed justice, committed perjury, and possessed guns. Moreover, the fact that the jury was instructed that it was to "confine [its] deliberations to the crimes with which Michael [was] actually charged" and that "[g]uilt can never be established by the mere fact of association" makes it even more unlikely that the error affected the verdict.[23]

### III.  Michael's Sentencing Challenge

We now focus on Michael's sentencing challenge.  Michael argues that the district court erred in using murder, as opposed to gun possession, as the most serious offense underlying his

_____

[23]Michael asserts that the cumulative effect of the admission of the challenged statements requires that he receive a new trial. But, "[b]ecause we have found that none of [Michael's] individual complaints resulted in substantial prejudice and that most are completely without merit, we reject the final contention that his conviction was tainted by cumulative error."  United States v. DeMasi, 40 F.3d 1306, 1322 (1st Cir. 1994).

obstruction of justice and perjury charges.[24]  The government

defends the use of murder and, in the alternative, claims that

using the most serious gun possession charge would have yielded the

same sentence.  "We review the sentencing court's application of

the guidelines de novo and . . . the factual findings underlying

that application for clear error."  United States v. Reyes-

Echevarria, 345 F.3d 1, 6 (1st Cir. 2003).

We find no error in the use of murder as the underlying

offense.  When Michael testified before the grand jury about his

knowledge of the Bulger/Flemmi group's reserve arsenal and Hussey's

whereabouts, the grand jury was investigating, and he had reason to

know it was investigating, whether "members and associates of

[that] Group [were involved] in violent racketeering activities,

such as . . . murder."  And, Michael was later charged with, and

convicted of, perjury and obstruction of justice in connection with

that investigation.  Therefore, the district court was justified in

using murder, and not gun possession, as the underlying offense.[25]

See U.S. Sentencing Guidelines Manual § 1B1.5, cmt. n.3 (2001)

---

[24]We note that Michael has made no arguments in the district
court or in this court questioning the constitutionality of the
Guidelines or their application to his sentence.  Therefore, we
need not consider the effect of United States v. Booker, 543 U.S.
___, 125 S. Ct. 738 (2005), with respect to Michael's sentence.

[25]Because we find that the district court did not err in using
murder as the underlying offense, we need not, and do not, address
the government's alternative argument.

("Where there is more than one [potential underlying] offense, the most serious such offense . . . is to be used.").

Michael, nevertheless, insists that his sentence should be vacated because the district court, in determining the underlying offense, looked to the 1995 indictment, see supra note 3, an indictment in which he was not charged, rather than to the Weeks indictment. Michael's argument fails because the district court in fact looked to both indictments. At sentencing, the government asserted that Michael's "actions clearly were to benefit the [Bulger/Flemmi group], whether it was as set forth in the [1995] indictment . . . , or . . . in the [Weeks] indictment." And, the district court subsequently stated that it was "adopt[ing] the government's position."[26] Moreover, even if the district court had looked only to the 1995 indictment, Michael's argument would still fail. The 1995 indictment, like the Weeks indictment, charged Stephen and other members of the Bulger/Flemmi group with

_____

[26]Although the district court later issued a written document in which it said that, in determining Michael's sentence, it had adopted the reasoning of the PSR, which mentions only the 1995 indictment, the district court's oral statement at the sentencing hearing controls. See United States v. Muniz, 49 F.3d 36, 42 n.5 (1st Cir. 1995) (recognizing that "[w]here . . . the district court's oral expression of its sentencing rationale varies materially from its subsequent written expression of that rationale, appellate courts have tended to honor the former at the expense of the latter"); see also United States v. Melendez-Santana, 353 F.3d 93, 100 (1st Cir. 2003) ("[W]e conclude that where the conditions of supervised release announced at the sentencing hearing conflict in a material way with the conditions of supervised release in the written sentencing order, the oral conditions control.").

engaging in violent racketeering acts, including murder.  Because the litigation involving the crimes charged in the 1995 indictment was ongoing when Michael testified before the grand jury, reference to the 1995 indictment would have been appropriate, as Michael's testimony was relevant to that prosecution.  See U.S. Sentencing Guidelines Manual § 2J1.2(c) (2001) (sentencing court is to apply the accessory after the fact Guideline "[i]f the offense involved obstructing the investigation or prosecution of a criminal offense" (emphasis added)).

Michael also asserts that because he did not know "the full nature and scope of his brother's criminal activities" or whether "any of the guns removed from the hid[e] had been used in a murder or other violent offense," the district court could not use murder as the underlying offense.  However, such knowledge was not a prerequisite to the use of murder as the relevant offense.  Cf. United States v. McQueen, 86 F.3d 180, 184 (11th Cir. 1996) ("[Defendant's] lack of knowledge of the specific offenses under investigation is irrelevant.").  All that was required was that Michael endeavored to "obstruct[] the investigation or prosecution of a [murder],"[27] U.S. Sentencing Guidelines Manual § 2J1.2(c)

---

[27]For an individual to qualify for the section 2J1.2(c) enhancement, it is not necessary that he succeed in obstructing justice--he may simply endeavor to do so.  United States v. Aragon, 983 F.2d 1306, 1315 (4th Cir. 1993) ("[E]ndeavoring to obstruct justice . . . is to be included within § 2J1.2." (citation omitted)).

-32-

(2001), and that he committed "perjury . . . in respect to a [murder],"[28] id. at § 2J1.3(c).  When Michael told the grand jury that he did not know Whether Hussey was alive, he knew, or at least had reason to know, that it was investigating whether she had been murdered by members of the Bulger/Flemmi group,[29] and the trial jury found that he attempted to impede that investigation.  That is sufficient to justify the use of murder as the underlying offense.

As a final matter, Michael challenges the use of murder on the ground that there was no evidence connecting the guns from the hide to any specific murder.  But, whether the guns were connected to a specific murder is irrelevant.  Michael had reason to know that the grand jury was investigating a murder, and the trial jury found that he sought to hamper that investigation.  Nothing more was required for murder to qualify as the underlying offense.

**Affirmed.**

---

[28]"Perjury is in respect to a criminal offense where the defendant knew or had reason to know, at the time of his perjury, that his testimony concerned such a criminal offense."  United States v. Leon-Reyes, 177 F.3d 816, 824 (9th Cir. 1999) (internal quotation marks omitted); see also United States v. Suleiman, 208 F.3d 32, 39 (2d Cir. 2000) ("[A]s long as the witness has been alerted to the fact that the grand jury is investigating a criminal offense, false answers to material questions will almost always merit enhanced punishment.").

[29]It was only a few months before that Michael witnessed Stephen confess to her murder.

-33-