# United States Court of Appeals
## For the First Circuit

No. 14-2245

UNITED STATES OF AMERICA,

Appellee,

v.

JAMES F. FORD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Thompson and Kayatta, Circuit Judges,
and Mastroianni,* District Judge.

Hunter J. Tzovarras for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

October 14, 2016

---

* Of the District of Massachusetts, sitting by designation.

**MASTROIANNI**, <u>District Judge</u>.   James F. Ford, with assistance from his wife Darlene and his sons Paul and Jim,[1] directed a marijuana-growing operation out of a home in Monroe, Maine.   Acting on a tip from Jim's girlfriend, police executed a search warrant and interviewed James, who openly described the sophisticated operation and discussed his previous marijuana-growing case in Massachusetts.   After a trial, a jury convicted him on the four counts charged in the superseding indictment: conspiracy, manufacturing over 100 marijuana plants, maintaining a residence for marijuana manufacturing, and possessing a firearm as a felon.   The district court applied a statutory mandatory minimum and sentenced James to 120 months in prison followed by eight years of supervised release.   On appeal, James challenges his convictions and his sentence.   Finding no reversible error, we affirm.

## I.   Background

On the evening of November 15, 2011, Maine drug enforcement officers, via loudspeaker, ordered the occupants of James's and Darlene's home to exit and executed a search warrant.   The officers

---

[1] To avoid confusion, we refer to the members of the Ford family by their given names.   Moreover, as we did in Darlene's appeal, we refer to the defendant as "James" and to his son as "Jim."   <u>See</u> <u>United States</u> v. <u>Ford</u>, 821 F.3d 63, 65 n.1 (1st Cir. 2016).

discovered a large marijuana-growing operation and two disassembled firearms under a makeshift bed outside of one of the cultivation rooms.

Later that evening, James discussed the operation in detail during a recorded interview. He described the intricate set-up, which he was "pretty proud of," but lamented the chores and expenses required by the operation. For example, James explained he had to empty air-conditioner buckets every morning or else they would "run over." He also had to collect water from a spring in Dixmont, Maine, using a 150-gallon tank, because the well water at the home was "horrible" and would "kill" the plants. In addition, James's crop "had bug problems," but he used hypoaspis miles, a type of mite, to control fungus gnats attracted to the marijuana plants. James told the officers he normally yielded either eight or twelve pounds of marijuana every nine weeks,[2] had produced thirty-seven total harvests, and had sold each pound for approximately $2,000. He deciphered some of the acronyms on a calendar officers found in the home, explaining "H1" referred to harvest one and "H2" meant harvest two.

Notably, James volunteered during the interview "you already know that I got popped in Mass" when explaining his previous

_____

[2] James initially stated he grew eight pounds every six months but later in the interview clarified that each harvest cycle was nine weeks.

growing operation in Wakefield, Massachusetts, which had been uncovered through a confidential informant. James revealed he paid his attorney in Massachusetts over $20,000 yet still "ended up with a frigging . . . felony conviction because they forced me to plea bargain." He further disclosed that he lost a house in connection with the bust, which he thought was unfair because the property was not purchased with "drug money" and his "name wasn't even on the search warrant."

On April 23, 2013, the grand jury returned a superseding indictment against members of the Ford family. Count 1 charged James, Darlene, and Paul with conspiring to manufacture 100 or more marijuana plants in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 2 contained the following language:

> On about November 15, 2011, in the District of Maine, defendants
>                    JAMES F. FORD
>                         AND
>                       PAUL FORD
> Did knowingly and intentionally manufacture a Schedule I controlled substance, specifically, 100 or more marijuana plants, and did aid and abet such conduct, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.
>
> It is further alleged that the penalty provisions of Title 21, United States Code, Section 841(b)(1)(B) apply to the conduct described herein.

Count 3 charged James and Darlene with maintaining a residence for the purpose of manufacturing marijuana in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2. And Count 5 charged James with

- 4 -

possessing firearms as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

A three-day jury trial commenced on November 19, 2013. During opening statements, defense counsel acknowledged that James grew marijuana. His attorney instead focused on defending against the conspiracy charge, rebutting the allegation that James grew over 100 marijuana plants, and asserting that the main purpose of the residence was not for growing marijuana. He argued that although Darlene "ke[pt] track of the family finances," she was not involved in the growing operation. Moreover, defense counsel informed the jury that, while James and Darlene were away, Jim "snuck" his girlfriend into the house and revealed the operation in an attempt to demonstrate he could support her. Jim "wanted to seem like he was part of" the operation even though he wasn't, defense counsel insisted.

James Weaver, a retired special agent with the Maine Drug Enforcement Agency, testified that Jim and Paul were covered in "small green flecks" and smelled of marijuana after exiting the home on the day of the search. Twenty-four marijuana plants were found in one room, an additional twenty-four plants in a separate room, and 163 starter plants in yet another room. All the plants had root systems, and the parties stipulated the plants were

marijuana.  The government also played the recorded interview of James for the jury without objection.

Weaver further testified that officers discovered two rifles in the home, both of which the parties stipulated were firearms under federal law.  He also described calendars found in the home which listed various figures next to the words "payday," "income," and "Boston."  Moreover, Weaver explained, the "Boston" figures often corresponded to "M" dates on another calendar, which he believed referred to "the market or move date, the date that [James] sold that marijuana."  Notebooks, also seized during the search, listed "$760 J and P payday" on various dates, as well as other figures next to the word "income."  Checkbooks reflected payments of $939 and $831 to the electric company.  Weaver testified the handwriting from the calendars, notebooks, and checkbooks all appeared to be the same as the handwriting from DMV records filled out by Darlene.[3]

Photographs, videos, and emails discovered during the search were presented to the jury.  The photographs showed James tending marijuana plants and collecting water from the spring in Dixmont.

---

[3] Another government witness, Michael Ballback, an asset forfeiture investigator for the Bureau of Alcohol, Tobacco, and Firearms, testified the handwriting from checks written by Darlene appeared to be the same as that in the notebooks and bank deposit slips.  James neither objected to this handwriting testimony at trial, nor has he challenged it on appeal.

A separate photograph showed Paul collecting water from the same spring. A video depicted James firing the Sig Sauer .229 rifle at a shooting range in Jackson, Maine, with Darlene narrating in the background.

The emails contained what appear to be discussions between members of the Ford family about the growing operation. For example, in one email to Paul, James complained that Paul was "useless at H time." James told Paul not to come to the house without calling because he had "expropriated way too much material recently, obviously to fund your journey into spaceland." Nevertheless, James informed Paul: "I am not booting you out of the business." In response, Paul complained to James that he did not understand "this crap about not being on your property," since he would "have to be over there at least two or three times a week to get $H_2O$ for this place and check on the annex." Paul continued: "I don't care if you say the annex is Mom's. I am still going to be working on it--lights, $CO_2$, refill, et cetera, et cetera. I did [a] load of work on the place getting it running while you were in Jamaica, thank you very much." Paul stated he did not want to hear "any more of this one-man operation bullshit anymore."

In another email, Paul told James that Darlene had been "spending a little too much on these cruises things, but, you know what, she does one hell of a job being a secretarial to this whole

conundrum we call business." Paul insisted that he be given "a little bit more of the responsibility," because "when it's just me and you, we run this place like NASA." Paul also recommended that James keep Jim "away from the actual ops" and instead "[s]et him up doing all of the soil and buckets and fert, cal ni., $CO_2$, anything we need." Weaver testified those materials are used for growing marijuana. In an email to Darlene, James reported Paul's comment that she was "a great secretary" and informed her that Paul brought "my bugs around 8:00 p.m." but did not stay long. Weaver testified he understood "bugs" to be a reference to the "hypoaspis miles mites" used to eat fungus growing on marijuana plants, and James conceded this point during his testimony.

Michael Ballback, the asset forfeiture investigator, testified James's and Darlene's bank records showed total deposits of $65,277.93 in 2009, $135,397.55 in 2010, and $80,935.44 in 2011, totaling $281,610.92, of which $216,156.45 were cash deposits. Moreover, the deposit dates often corresponded with the "income" dates listed in the notebooks and the "M" dates listed in the calendars seized during the search. James and Darlene paid $25,336.62 for electricity from 2009 to 2011 and $13,097.98 for rental cars from 2010 to 2011.

Jim's ex-girlfriend, Cassandra Spencer, testified for the government. Prior to her testimony, James renewed his pretrial

hearsay objection. Defense counsel argued Spencer's testimony as to statements made by Jim when he revealed the marijuana operation to her was not admissible under Federal Rule of Evidence 801(d)(2)(E) as statements "in furtherance of the conspiracy." Based on the government's proffer and its recollection of Spencer's testimony during Darlene's trial, the district court ruled that the statements furthered the conspiracy because

> she was told, basically, not to say anything, that she was suspicious about what was going on, and the whole purpose of the blindfolding and the displaying of the alleged operation was to quell her suspicions and to get her to be quiet about them.

> So quieting someone who's suspicious about the conspiracy is in furtherance of the conspiracy from my viewpoint.

Spencer testified she became pregnant shortly after she began dating Jim. Jim told her that he worked with his father and brother "building control systems that students would train on" for a company called Boaleeco,[4] but he "never seemed to . . . maintain an actual work schedule." In particular, the night before one system was to be delivered, Jim "had gotten so high that he couldn't wake up." That surprised Spencer, so she began to question Jim about what he did for a living. When asked by the

---

[4] James testified that he built training benches for trade schools on a contract basis for Boaleeco while living in Maine. James also testified his sons helped him with the contract work "quite often" and he would pay them.

prosecutor "what exactly . . . were your questions," Spencer testified: "Well, you're not working like you said you were, you know. And why is it okay that you're not delivering these systems as you said, you know? I didn't understand what was going on." One night, Jim blindfolded Spencer, brought her to his parents' home while they were away, and showed her the marijuana-growing operation.

When the prosecutor asked about Spencer's conversation with Jim that night, James renewed his hearsay objection. The district court again overruled the objection, explaining:

> [I]f you're involved in a drug-trafficking conspiracy and you have a serious, intimate relationship with someone and they begin to suspect what you're doing and you bring them along and you say, this is what we're doing, but this is the family business, but you--now that you know, you have to keep quiet, that is in furtherance of the conspiracy.

Defense counsel pressed that Spencer "never said she was suspicious that he was doing anything illegal or growing marijuana," but the court held firm, responding:

> That doesn't matter. He decided to take her in. She was suspicious about what he was doing generally. . . . Figure that perhaps, over the course of time, she would really begin to suspect and would unearth what exactly he was doing. So he decided to preempt, bring her in, show her the family business, and at that point tell her to keep quiet.

Spencer then testified Jim told her that he and his brother "did most of the day-to-day work" for the operation, whereas "his

- 10 -

dad basically was the overseer." He stated Darlene "dealt with all the money," including paying the bills as well as paying the brothers approximately $500 each week in cash for their work. Jim also told Spencer that she could not tell anyone this information; even Jim's "parents and his brother couldn't know that I was being let in on this secret." On cross-examination, Spencer explained that she questioned Jim's employment because she was concerned about his ability to support her and their child. It was after Spencer raised this concern that Jim revealed the operation and told her not to worry because he was growing marijuana with his father. Spencer eventually tipped off the police to the growing operation.

The government's final witness was James Bruce, a Massachusetts State Trooper. After the government proffered that he would testify as to the prior marijuana-growing operation in Massachusetts, James objected that the testimony was inadmissible under Rules 404(b) and 403 of the Federal Rules of Evidence. Defense counsel argued the testimony was not relevant for any special purpose because James was not disputing that he knowingly grew the marijuana in Maine. The district court disagreed, explaining that, in the absence of a stipulation, the evidence was relevant to James's motive, opportunity, intent, preparation, plan, and knowledge, because the government retained the burden of

proving each element of the crime, regardless of the defenses raised. In response to defense counsel's argument that the probative value of the evidence was outweighed by its prejudicial effect, the court offered to provide the jury a limiting instruction.

Bruce testified that he executed a search warrant at 2 Fellsmere Avenue in Wakefield, Massachusetts on October 11, 2002. He discovered three rooms "devoted entirely to growing marijuana." The operation was "pretty impressive," with plants in different stages of maturity and a variety of equipment. During the search, James informed Bruce that he did not reside at the house but actually lived across the street at 5 Fellsmere Avenue. James consented to a search of that home, where Bruce discovered another grow operation. Bruce testified the operations were consistent with distribution, rather than personal use. The parties stipulated that James was convicted in state court of possession of marijuana with intent to manufacture, distribute, or dispense, a crime punishable by imprisonment for a term exceeding one year under Massachusetts law. Documents showed that 2 Fellsmere Avenue was forfeited to Massachusetts authorities. The district court instructed the jury it could not consider this evidence as proof that James "is a bad person or that . . . he is the kind of person who is likely to commit a crime," but it could use the evidence to

evaluate his state of mind, intent, motive, opportunity to commit the charged crimes, or to determine if James acted according to a plan or by accident or mistake.

After the government rested, James took the stand, testifying he moved to Maine because living in Wakefield, Massachusetts became too expensive. James intended to continue his contracting work for Boaleeco, with which his sons helped him, as well as install heating systems. James testified he did not buy the Maine house for the purpose of growing marijuana, but decided to do so when his work for Boaleeco dried up. He insisted his family had no input in the decision and provided no help in the operation. In fact, James testified, his wife had no knowledge of the operation, although his sons did. But James claimed he encouraged his sons to get legal jobs.

James explained that whenever he received a check, he would cash it and give the money to Darlene, who kept track of the family's finances in the notebooks. James testified, however, that he did not tell Darlene any income was derived from marijuana; rather, he told her it was from contracting work with Boaleeco. James and Darlene rented cars often to visit her parents in New Hampshire and Massachusetts. James also sold marijuana in Massachusetts during the trips, but he maintained Darlene was unaware the vehicles were stocked with marijuana. James agreed

the three grow rooms contained over 100 marijuana plants (including "starter plants") on the day of the search, all with stems, leaves, and root systems.

After the defense rested, James renewed his objection to the verdict form, which asked the jury to make a finding as to the number of plants James was individually responsible for manufacturing. Defense counsel argued that the superseding indictment, by alleging both James and Paul manufactured 100 or more marijuana plants, failed to apprise James that he would be held responsible for that entire amount. The district court disagreed, explaining the indictment put James on notice he would have to defend against possessing 100 or more marijuana plants and, in fact, defense counsel argued during opening statements that James was not responsible for that amount. The court, however, agreed to give the jury the option of finding James responsible for manufacturing 50 or more plants, or 100 or more plants.

During final instructions, the court reiterated its prior limiting instruction regarding prior bad acts. The court also instructed the jury that, if it found James guilty of the manufacturing charge, it would have to decide "the quantity of marijuana that he, and not anyone else, intentionally manufactured." After closing arguments and deliberations, the

jury returned its verdict. It found James guilty on all four counts. Moreover, as to Count 2, the jury found that James manufactured 100 or more marijuana plants.

At sentencing, James objected to application of 21 U.S.C. § 841(b)(1)(B)(vii), which prescribes a ten-year mandatory minimum for manufacturing 100 or more marijuana plants if the individual was previously convicted of a felony drug offense. Defense counsel again argued, relying on Alleyne v. United States, 133 S. Ct. 2151 (2013), that the superseding indictment did not allege at least 100 plants were attributable solely to James. Defense counsel also argued the Eighth Amendment prohibited the mandatory minimum because some states had legalized marijuana and the federal government was not prosecuting its production in those states. The district court rejected both arguments. It did note, however, that in light of the state legalizations "we are in sort of an odd time for purposes of marijuana." After calculating a Sentencing Guideline range of 97 to 121 months of imprisonment, which produced a range of 120 to 121 months when combined with the statutory minimum, the court sentenced James to 120 months in prison to be followed by eight years of supervised release.

## II. Analysis

James raises four arguments on appeal. First, he argues the superseding indictment, in violation of Alleyne, 133 S. Ct. 2151,

did not sufficiently notify him that he would be held responsible for manufacturing 100 or more marijuana plants.  As a result, James argues, the district court erred in instructing the jury to make a quantity determination and in applying the ten-year mandatory minimum sentence set forth in 21 U.S.C. § 841(b)(1)(B)(vii).  Second, James argues the district court improperly admitted Spencer's hearsay testimony under the exception for statements "in furtherance of a conspiracy."  Fed. R. Evid. 801(d)(2)(E).  Third, James challenges the admission of Bruce's testimony regarding the Massachusetts growing operation.  Lastly, James contends his sentence is prohibited by the Eighth Amendment.

## A.  Alleyne Claim

We review James's preserved Alleyne claim, based on an allegedly deficient indictment, de novo.  See United States v. Rose, 802 F.3d 114, 127 (1st Cir. 2015); United States v. Etienne, 772 F.3d 907, 922 (1st Cir. 2014).

In Alleyne, the Supreme Court, extending the logic of Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), held that "any fact that increases the mandatory minimum [penalty for a crime] is an 'element' that must be submitted to the jury" and found beyond a reasonable doubt.  Alleyne, 133 S. Ct. at 2155.  Both Alleyne and Apprendi also emphasized the necessity of including these penalty-increasing facts in the indictment.  See id. at 2159-60; Apprendi,

530 U.S. at 476, 478-80; See United States v. McIvery, 806 F.3d 645, 648-49 (1st Cir. 2015), cert. denied, 2016 WL 1599830 (Oct. 3, 2016); see also United States v. Cotton, 535 U.S. 625, 627 (2002). "Defining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment." Alleyne, 133 S. Ct. at 2161. This, in turn, allows the defendant to prepare an appropriate defense. Id. at 2160; Apprendi, 530 U.S. at 478.

James asserts the superseding indictment violated these principles because it alleged James and Paul manufactured 100 or more marijuana plants, which meant James might have produced between one and 99 plants with Paul producing the remainder.

"An indictment is sufficient 'if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and enables him to enter a plea without fear of double jeopardy.'" United States v. Parigian, 824 F.3d 5, 9 (1st Cir. 2016) (quoting United States v. Yefsky, 994 F.2d 885, 893 (1st Cir. 1993)). On the other hand, mistaken or omitted indictment language is reversible if "it deprived the appellant of notice or otherwise misled him to his detriment." United States v. Eirby, 262 F.3d 31, 38 (1st Cir. 2001); see also

- 17 -

<u>United States</u> v. <u>Lanza-Vázquez</u>, 799 F.3d 134, 148 (1st Cir. 2015) (discussing related concept of prejudicial variance).

The superseding indictment could have been clearer as to the number of marijuana plants individually attributable to James and Paul. The first clause of Count 2 stated that on November 15, 2011, James and Paul "[d]id knowingly and intentionally manufacture . . . 100 or more marijuana plants." Considering this language in isolation, it is not entirely clear, for example, whether James and Paul separately manufactured 100 or more plants each, or instead together manufactured that amount. Nevertheless, reading the indictment as a whole, we conclude James had adequate notice that he was alleged to be responsible, and thus subject to punishment, for manufacturing 100 or more marijuana plants.

Count 2 also included an aiding and abetting charge under 18 U.S.C. § 2. Specifically, it stated James and Paul "did aid and abet such conduct, in violation of . . . Title 18, United States Code, Section 2." Thus, even under James's theory, the aiding and abetting language still apprised him that he could be punished for all 100 plants. <u>See</u> 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands,

induces or procures its commission, is punishable as a principal.").[5]

Count 2 further stated "the penalty provisions of" 21 U.S.C. § 841(b)(1)(B) apply. Those provisions set forth, in relevant part, a ten-year mandatory-minimum penalty for manufacturing "100 or more marihuana plants regardless of weight" if the individual was previously convicted of a felony drug offense. 21 U.S.C. § 841(b)(1)(B).[6] This penalty language therefore indicated that James would need to defend against the allegation that he manufactured 100 or more marijuana plants or else risk application of the mandatory minimum.

Moreover, it is clear James had knowledge of this penalty-increasing fact, as defense counsel asserted during opening statements that James "wasn't manufacturing over a hundred

---

[5] Although the statute is written in the disjunctive ("or aids, abets . . .") and the indictment was in the conjunctive ("and did aid and abet . . ."), this type of discrepancy is generally considered permissible. See, e.g., United States v. Farish, 535 F.3d 815, 823-24 (8th Cir. 2008); cf. United States v. Torres-Colón, 790 F.3d 26, 34 (1st Cir. 2015) ("[I]t is well-established that where an indictment charges in the conjunctive (using 'and') but the statute is framed in the disjunctive (using 'or'), the government need only prove one of the charged acts at trial."). In any event, this issue has not been raised on appeal, nor would it change the result in this case.

[6] Section 841(b)(1)(B) also prescribes a five-year mandatory minimum penalty for manufacturing 100 or more plants if the individual had not been previously convicted of a felony drug offense.

- 19 -

marijuana plants" on the day of the search.  See McIvery, 806 F.3d at 652 ("[T]he defendant was on ample notice . . . of both the government's assertion that the statutory mandatory minimum applied and his potential exposure to that mandatory minimum.").

Accordingly, this was not a case in which a latent ambiguity throughout an indictment lured a defendant to construe it one way, only to be surprised at trial.  Rather, this was a case in which a patent ambiguity in the syntax of a single sentence was resolved by the thrust of the indictment as a whole and read by counsel as placing at issue precisely that which was at issue.

Even if James could demonstrate an Alleyne error on this theory, it was clearly harmless beyond a reasonable doubt.  See McIvery, 806 F.3d at 649-50 (holding that Alleyne errors are subject to harmless-error review).  The district court appropriately instructed the jury to decide the quantity of marijuana that James, "and not anyone else, intentionally manufactured."  And in response to James's Alleyne argument, the court added to the verdict form the option of finding James responsible for manufacturing 50 or more plants, in addition to 100 or more plants.  The jury ultimately found James had manufactured 100 or more plants.  This finding was fully consistent with the overwhelming and uncontroverted evidence at trial.  Indeed, James's defense was that he manufactured the marijuana

alone, and, as the district court noted, he testified unequivocally to that effect.[7]  Finally, at oral argument, James's appellate counsel could not articulate how the trial would have been any different if the indictment had been clearer.

**B.  Hearsay Claim**

James next challenges the admission of Jim's out-of-court statements to Spencer under Federal Rule of Evidence 801(d)(2)(E). Under that rule, statements made by a defendant's co-conspirators "during and in furtherance of the conspiracy" do not qualify as hearsay.  Fed. R. Evid. 801(d)(2)(E).  "The proponent of such a statement must prove, by a preponderance of the evidence, that the declarant and the defendant were members of a conspiracy when the statement was made, and that the statement was made in furtherance of the conspiracy."  United States v. Ciresi, 697 F.3d 19, 25 (1st Cir. 2012).  "A district court's determination 'as to whether this burden has been met is known in this circuit as a Petrozziello

---

[7] Although defense counsel asserted during opening statements that James "wasn't manufacturing over a hundred marijuana plants" on the day of the search, James testified that his house contained over 100 plants, all of which had stems, leaves, and root systems, on that day.  His trial strategy instead was that the jury should not consider the "starter plants" to be marijuana plants. Consistent with that strategy, defense counsel objected to the government's proposed instruction defining "plant" and sought to leave the term undefined.  The district court ultimately sided with James, and the issue has not been raised on appeal.

ruling,' after our holding in United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977)." Id. (quoting United States v. Mitchell, 596 F.3d 18, 23 (1st Cir. 2010)).

"A court may provisionally admit a statement under Rule 801(d)(2)(E) and defer its final Petrozziello ruling until the close of evidence." United States v. Paz-Alvarez, 799 F.3d 12, 29 (1st Cir. 2015). "To preserve a challenge to a district court's Petrozziello ruling, a defendant must object on hearsay grounds when his or her coconspirator's statement is provisionally admitted and must renew the objection at the close of evidence." Ciresi, 697 F.3d at 25-26. Preserved challenges are reviewed for clear error, and unpreserved challenges are reviewed for plain error. Id. at 26.

The wrinkle in this case is the district court did not provisionally admit the out-of-court statements but allowed the complete and final admission during Spencer's testimony. The government contends James still had to renew the hearsay objection at the close of evidence, and his failure to do so renders this challenge unpreserved and subject to plain error review. James asserts he raised the issue before trial, renewed his objection at trial prior to Spencer's testimony, and renewed the objection yet again during her testimony. As the district court made clear it was not deferring a final ruling on the issue until the close of

evidence,[8] James argues he was not required to renew the objection any further.  We assume, favorably to James, that in light of this posture, he preserved the hearsay challenge and clear error review applies.[9]

Although "no precise formula" exists, "[g]enerally speaking, . . . a coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy."  United States v. Piper,

---

[8] Indeed, when James renewed his hearsay objection during Spencer's testimony, the district court stated:  "Well, that's a--that ruling I've already addressed, and I reject."

[9] This assumption may be overly generous in light of this circuit's precedents requiring that the Petrozziello determination be made at the end of all the evidence and placing the onus on the defendant to request such an express trial-end finding.  See United States v. Mangual-Garcia, 505 F.3d 1, 8-9 (1st Cir. 2007); United States v. Flemmi, 402 F.3d 79, 94 (1st Cir. 2005); United States v. Perez-Ruiz, 353 F.3d 1, 12 (1st Cir. 2003); see also United States v. Richardson, 14 F.3d 666, 669 (1st Cir. 1994) (district court made final Petrozziello determination at the close of the government's case rather than at the close of all the evidence, but defendant's failure to object to this procedure rendered hearsay challenge unpreserved); United States v. Ortiz, 966 F.2d 707, 715 (1st Cir. 1992) (despite district court's promise to make a trial-end determination and failure to do so, that error did not "obviate[] the need for the defendants to lodge an objection at the proper time").  But see United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993) ("The party at whom the evidence is aimed must object to the statement when it is offered; and, if the district court accepts the evidence de bene, must then ask the court at the close of all the relevant evidence to strike the statement . . . ." (emphasis added)).  Nevertheless, as we explain below, the district court's error in admitting Spencer's hearsay testimony was harmless even under the more defendant-friendly clear error standard of review.  Accordingly, we need not definitively resolve the preservation issue in this case.

298 F.3d 47, 54 (1st Cir. 2002); see also United States v. LiCausi, 167 F.3d 36, 50 (1st Cir. 1999) ("The statement is admissible if it 'tends to advance the objects of the conspiracy as opposed to thwarting its purpose.'" (quoting United Statement v. Fahey, 769 F.2d 829, 838 (1st Cir. 1985)). The "statement 'need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way.'" Piper, 298 F.3d at 54 (quoting United States v. Martínez-Medina, 279 F.3d 105, 117 (1st Cir. 2002)). However, "[a] judicial determination that a coconspirator's statement tended to further the conspiracy must be supported by some plausible basis in the record." Id. As such, "the 'in furtherance' requirement represents a real limitation on the admissibility of coconspirator statements," and the proponent "is not entitled to a free pass." Id.

The district court found the "in furtherance" requirement was satisfied on two related grounds. First, the district court explained that Spencer became suspicious about the growing operation, and Jim's decision to reveal the operation to her, coupled with his instruction not to tell anyone, was intended "to quell her suspicions and to get her to be quiet about them." Alternatively, the district court found that Spencer "was suspicious about what [Jim] was doing generally," and rather than

risk that she would eventually "unearth what exactly he was doing," Jim "decided to preempt, bring her in, show her the family business, and at that point tell her to keep quiet."

As an initial matter, we assume, since no party has argued otherwise, that one of the main objects of the conspiracy was to keep the growing operation secret. See Grunewald v. United States, 353 U.S. 391, 405 (1957) (discussing acts of concealment in furtherance of a conspiracy). Nevertheless, we conclude the district court erred in finding Jim's statements were in furtherance of this objective.

As to the first ground, there is no support for the district court's finding that Spencer harbored suspicions about the growing operation. She testified only to her concern that Jim was not gainfully employed and thus could not provide for their soon-to-be-born child.[10] Jim then revealed the operation to her in response to a legitimate employment concern, telling her not to worry because he was making money growing marijuana. Jim's revelation under these circumstances--attempting to placate a significant other's financial worries--cannot reasonably be said to further the goals of the conspiracy.[11] On the contrary, as James asserts,

---

[10] In fact, consistent with Jim's explanation to Spencer, James testified that Paul and Jim helped with his contracting work for Boaleeco.

[11] Perhaps Jim's instruction to Spencer to keep quiet, in isolation, could be deemed in furtherance of the conspiracy if it

the statements were in furtherance of Jim's relationship with Spencer. Cf. LiCausi, 167 F.3d at 50 (explaining that the co-conspirator's statement "is more appropriately characterized as made simply to avoid an argument with [the co-conspirator's] girlfriend" and thus was not admissible under the in furtherance hearsay exception).

The district court's alternative explanation fares no better. Revealing the operation, in response to a generalized suspicion regarding Jim's employment status, does not further the goal of concealing the conspiracy. Jim's statements constituted "the polar opposite of an attempt to conceal the conspiracy." Piper, 298 F.3d at 56. In fact, his disclosure led directly to the conspiracy's downfall, as Spencer divulged the operation to the authorities. In this regard, Jim's statements proved "antithetic to the central object of the charged conspiracy." Id. at 55. Further, in revealing the operation, Jim was not attempting to recruit Spencer or otherwise seek her assistance in the scheme. Rather, he told her the other Ford family members "couldn't know that [she] was being let in on this secret." Under these

---

had been the only out-of-court statement admitted. Here, however, the "keep quiet" statement came directly after Spencer recounted Jim's statement as to the family members' roles in the growing operation, and both statements were admitted together as part of the "in furtherance" equation. Under these circumstances, therefore, an overly narrow parsing of the combined statements is not appropriate.

circumstances, we believe the district court's rationale stretched the in furtherance exception too far.[12]

We conclude, however, that this error does not warrant reversal. "A non-constitutional evidentiary error is harmless (and, therefore, does not require a new trial) so long as it is

_____

[12] Our conclusion also finds support outside of this circuit. See United States v. Manfre, 368 F.3d 832, 838-39 (8th Cir. 2004) (explaining that "[a] statement of a conspirator which conceals the conspiracy without revealing any of the conspirators' illegal objectives from one who appears suspicious is in furtherance of the conspiracy," but "'[a] statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy.'" (quoting United States v. Mitchell, 31 F.3d 628, 632 (8th Cir. 1994)); City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 559 (11th Cir. 1998) ("A statement that merely discloses the existence of a conspiracy to a non-conspirator, that merely 'spills the beans,' with no intention of recruiting the auditor into the conspiracy does not further the conspiracy."); United States v. Shores, 33 F.3d 438, 444 (4th Cir. 1994) ("Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be 'in furtherance' of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives . . . but not if they were intended to be nothing more than idle chatter or casual conversation about past events." (internal citations omitted)); United States v. Layton, 720 F.2d 548, 556 (9th Cir. 1983) ("Although statements designed to induce a listener to join a conspiracy are admissible, mere 'casual admission[s] of culpability to someone [the declarant has] individually decided to trust' are not admissible." (quoting United States v. Fielding, 645 F.2d 719, 726 (9th Cir. 1981)), overruled in part on other grounds by United States v. W.R. Grace, 526 F.3d 499 (9th Cir. 2008). But see United States v. Phillips, 219 F.3d 404, 419 (5th Cir. 2000) ("Because Jean attempted to explain to her daughter the nature of the conspiracy in an effort to exact sympathy so that the scheme could remain a secret, the statements were undoubtedly made 'in furtherance' of the conspiracy, and as such were properly admitted.").

highly probable that the error did not influence the verdict."

Piper, 298 F.3d at 56.

> There is no bright-line rule for divining when particular errors that result in a jury's exposure to improper evidence are (or are not) harmless. Rather, a harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue.

Id. at 57 (quoting United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993)).

The error here is clearly harmless as to three of the counts. The improperly admitted statements were not relevant to the firearm charge. Moreover, the facts supporting the manufacturing and maintaining a residence for marijuana manufacturing counts were conceded at trial, rendering the hearsay testimony plainly cumulative of other evidence.

Although somewhat of a closer question, we also conclude the district court's error was harmless as to the conspiracy count. Even without Spencer's hearsay testimony, there is strong additional evidence pointing to a conspiracy, and we can say "with fair assurance . . . that the judgment was not substantially swayed by the error." United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012) (quoting Kotteakos v. United States, 328 U.S. 750, 765

(1946)).  The conspiracy evidence included admitted emails (described in detail in section I supra), in which James and Paul indicate, in their own words, that the operation was a family affair.  In addition to the emails, James admitted during his testimony that the notebooks and calendars, which contained various notations and figures corresponding to the production and sale of marijuana, were maintained by Darlene.

Given the "overwhelming" evidence of a family-wide conspiracy, United States v. Tejeda, 974 F.2d 210, 215 (1st Cir. 1992), we conclude "it is 'highly probable' that the result would have been the same" in the absence of Spencer's hearsay testimony. United States v. Colon-Munoz, 192 F.3d 210, 229 (1st Cir. 1999) (quoting United States v. Vigneau, 187 F.3d 82, 85-86 (1st Cir. 1999)).

## C.    Admissibility of Bruce's Testimony

James additionally challenges the admission of Bruce's testimony, in which he described the prior Massachusetts growing operation, under Rules 404(b) and 403.  As James raised this objection at trial, we review the district court's determination for abuse of discretion.  United States v. Pelletier, 666 F.3d 1, 5 (1st Cir. 2011).

Under Rule 404(b), "'[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to

- 29 -

show that on a particular occasion the person acted in accordance with the character,' i.e., as propensity evidence." United States v. Appolon, 715 F.3d 362, 372 (1st Cir. 2013) (quoting Fed. R. Evid. 404(b)(1)). "Evidence of other acts may be admissible, however, if it has 'special relevance,' such as proving 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident,' Fed. R. Evid. 404(b)(2)." Id. at 372-73 (internal citation omitted). We utilize a two-part test in evaluating admissibility under Rule 404(b). First, we ask whether the evidence has "special relevance"; then, we apply Rule 403 and consider whether its probative value is substantially outweighed by the danger of unfair prejudice. Pelletier, 666 F.3d at 5.

Even assuming Bruce's testimony was specially relevant for one or more non-propensity purposes, its admissibility under Rule 403 is questionable. To be sure, even though James did not contest the allegation that he intentionally grew the marijuana in Maine, the government still retained the burden to prove each element of the charges beyond a reasonable doubt and, as a general matter, was "entitled to prove its case by evidence of its own choice." Old Chief v. United States, 519 U.S. 172, 186 (1997); see United States v. Varoudakis, 233 F.3d 113, 121 (1st Cir. 2000) ("[W]e have held that evidence of prior bad acts may be probative even

when it is relevant to an issue that the defendant does not contest," because "the fact that the defendant does not contest the issue for which the prior bad act evidence is offered does not, 'by itself, remove those issues from the case.'" (quoting United States v. Ferrer-Cruz, 899 F.2d 135, 138 (1st Cir. 1990)).

But the fact that James did not dispute (and explicitly conceded) this central allegation renders the probative value of Bruce's testimony significantly reduced. See Varoudakis, 233 F.3d at 121-24. Given the other evidence presented and defense counsel's concession during opening statements that James grew the marijuana, the government arguably did not need the testimony regarding the Massachusetts growing operation. See id. at 122 (under Rule 403, courts should weigh the risk of unfair prejudice against "the government's need for the evidence," among other factors (citing Old Chief, 519 U.S. at 184)); cf. United States v. Moccia, 681 F.2d 61, 64 (1st Cir. 1982) ("[T]here was so much other evidence of guilt in the case that it is difficult to believe the prior conviction was needed."). Also weighing against the probative value of the prior growing operation is its remoteness in time, as the Massachusetts bust occurred nine years before the search in Maine. See United States v. Mare, 668 F.3d 35, 41 (1st Cir. 2012).

Moreover, the risk of unfair prejudice stemming from Bruce's testimony was high.  Although this evidence "is not particularly shocking" and "[t]here is little danger that it swayed the jury toward a conviction on an emotional basis," the risk is that the jury used it to infer criminal propensity.  Varoudakis, 233 F.3d at 122.  That risk is especially pronounced where, as here, the prior conduct is identical to the charged crime.  See id. at 123; see also Old Chief, 519 U.S. at 185, 191.  In fact, the grow operations were extremely similar; they were both large and highly sophisticated, with plants in different stages of growth and a variety of equipment.

Furthermore, in view of the negligible probative value of the evidence, it is not clear the district court's limiting instructions were sufficient to curb its prejudicial effect.  See United States v. Garcia-Rosa, 876 F.2d 209, 222 (1st Cir. 1989) ("But the prejudice in this case was so severe and unfair that it cannot be remedied merely through a limiting instruction. In fact, if limiting instructions could remedy all such errors, the government would easily be able to circumvent Rules 404(b) and 403."), vacated on other ground sub nom., Rivera-Feliciano v. United States, 498 U.S. 954 (1990).

- 32 -

At the same time, however, the nature of James's defense and the overwhelming evidence of guilt render any error harmless.[13] James conceded throughout the trial that he grew the marijuana in Maine. Moreover, the jury had already heard, without objection, the recorded interview of James, in which he discussed the Massachusetts growing operation.[14] Under these circumstances, therefore, we are confident the verdict would not have been different if the district court had excluded Bruce's testimony. See United States v. Hicks, 575 F.3d 130, 143 (1st Cir. 2009).

## D. Eighth Amendment Claim

Lastly, James contends his ten-year mandatory-minimum sentence for manufacturing marijuana is grossly disproportionate to the offense and, therefore, violates the Eighth Amendment. He points to the public's evolving views on marijuana, including state-law decriminalization and legalization (medicinal and recreational) measures. He also cites the federal government's general policy of not prosecuting cultivation and distribution activities that are in compliance with "strong and effective [state marijuana] regulatory and enforcement systems." Memorandum from

---

[13] Accordingly, we need not definitively decide whether the district court abused its discretion in performing the Rule 403 balancing.

[14] Not only did James fail to object to the admission of the recording at trial, but he has not challenged it on appeal.

James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice, for All U.S. Att'ys 2 (Aug. 29, 2013), available at https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf. We review this Eighth Amendment challenge de novo. United States v. Raymond, 697 F.3d 32, 40 (1st Cir. 2012).

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" Ewing v. California, 538 U.S. 11, 20 (2003) (plurality opinion) (quoting Harmelin v. Michigan, 501 U.S. 957, 996-97 (1991) (Kennedy, J., concurring in part and concurring in judgment)).[15] This principle, however, "'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are grossly disproportionate to the crime.'" Graham v. Florida, 560 U.S. 48, 60 (2010) (quoting Harmelin, 501 U.S. at 997, 1000-01 (Kennedy, J., concurring in part and concurring in judgment)). In

---

[15] Although the Supreme Court's "precedents in this area have not been a model of clarity," Lockyer v. Andrade, 538 U.S. 63, 72 (2003), the Court has since relied on Justice Kennedy's concurrence in Harmelin, calling it "[t]he controlling opinion." Graham v. Florida, 560 U.S. 48, 60 (2010); see also Ewing, 538 U.S. at 23-24 (plurality opinion); United States v. Cruz-Fernández, 607 F. App'x 1, 3 (1st Cir. 2015) (unpublished opinion). Moreover, as Justice Kennedy explained in Harmelin, despite this lack of clarity, the Court's Eighth Amendment decisions "yield[] some common principles that give content to the uses and limits of proportionality review." Harmelin, 501 U.S. at 998 (Kennedy, J., concurring in part and concurring in judgment).

determining whether a sentence is grossly disproportionate, we first undertake a threshold comparison between "the gravity of the offense and the severity of the sentence." Id. at 60. If, after making this threshold comparison, "we conclude there is no 'gross disproportionality . . . the inquiry ends there.'" United States v. Lyons, 740 F.3d 702, 731 (1st Cir. 2014) (quoting Raymond, 697 F.3d at 40).

We also must be mindful of our "substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." Solem v. Helm, 463 U.S. 277, 290 (1983). After all, "the Constitution 'does not mandate adoption of any one penological theory.'" Ewing, 538 U.S. at 25 (quoting Harmelin, 501 U.S. at 999 (Kennedy, J., concurring in part and concurring in judgment)). In light of this deference and the rigorous standard for demonstrating gross disproportionality, "a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." Solem, 463 U.S. at 290 n.16. Indeed, "'[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.'" Ewing, 538 U.S. at 21 (plurality opinion) (quoting Rummel v. Estelle, 445 U.S. 263, 272 (1980)); see id. at 19-20 (upholding California's "three strikes" law and the

imposition of a 25 years to life sentence for stealing golf clubs); Harmelin, 501 U.S. at 996 (upholding a sentence of life in prison without parole for possession of more than 650 grams of cocaine); Hutto v. Davis, 454 U.S. 370, 374-75 (1982) (upholding a sentence of forty years for possession and distribution of nine ounces of marijuana).

James's challenge fails at the threshold inquiry. We recognize that, for Eighth Amendment purposes, "courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society.'" Graham, 560 U.S. at 58 (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). Those evolving standards certainly now point towards a markedly different level of acceptance of marijuana than in the past. "But within extremely broad limits, Congress--which unlike the judiciary is popularly elected--sets both sentencing policy and the prescribed range of sentences for federal drug crimes . . . ." United States v. Jones, 674 F.3d 88, 96 (1st Cir. 2012). And, despite the evolving consensus on marijuana policy, manufacturing marijuana remains a serious crime under federal law, subject to the penalties set forth in 21 U.S.C. § 841(b). See United States v. Ford, 625 F. App'x 4, 7 (1st Cir. 2015) (unpublished opinion).

In the end, James's arguments as to federal marijuana sentencing policy are more appropriately directed at the Executive and Legislative branches. "Relief in cases such as this--if there is any--must come, in the first instance, in the exercise of restraint and wisdom in the charging decision of the prosecutor, or in the exercise of the clemency power; both are executive not judicial functions and leave us powerless to intercede to grant relief."[16] Paladin, 748 F.3d at 454.

### III. Conclusion

For the reasons given, we **affirm**.

---

[16] At oral argument, the government sought to deflect its role in the sentence, as if it had no choice in the matter, and place responsibility in the hands of Congress. But see Jones, 674 F.3d at 96-97 ("[T]he prosecution also had discretion in this case to not seek the mandatory sentence.").